1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL BAKER,

11              Plaintiff,                    No. 2: 09-cv-2757 MCE KJN P

12        vs.

13   PEREZ, et al.,

14              Defendants.                   FINDINGS & RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action

18   pursuant to 42 U.S.C. § 1983.  This action is proceeding on the amended complaint filed April 5,

19   2010, as to defendants Miller, Swingle, Medina, St. Laurent and Bowers.  Plaintiff alleges that he

20   received inadequate medical care while housed at High Desert State Prison ("HDSP") in

21   violation of the Eighth Amendment and state law.

22              Pending before the court is defendants' summary judgment motion filed August

23   10, 2011.  Defendants argue that they did not violate plaintiff's Eighth Amendment rights.

24   Defendants also argue that they are entitled to qualified immunity.

25              On February 9, 2012, plaintiff filed his opposition to defendants' summary

26   judgment motion.  On February 21, 2012, the undersigned granted defendants an extension of

1

1   time to March 26, 2012, to file their reply to plaintiff's opposition.  Defendants did not file a

2   reply within that time.

3   　　　　　After carefully reviewing the record, the undersigned recommends that

4   defendants' motion be granted in part and denied in part.

5   II.  Legal Standard for Summary Judgment

6   　　　　　Summary judgment is appropriate when a moving party establishes that the

7   standard set forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should

8   be rendered  if . . . there is no genuine issue as to any material fact, and that the movant  is

9   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

14  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

15  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

16  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

17  file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

18  upon motion, against a party who fails to make a showing sufficient to establish the existence of

19  an element essential to that party's case, and on which that party will bear the burden of proof at

20  trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the

21  nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.  In such a

22  circumstance, summary judgment should be granted, "so long as whatever is before the district

23  court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

24  satisfied."  Id.

25  　　　　　If the moving party meets its initial responsibility, the burden then shifts to the

26  opposing party to establish that a genuine issue as to any material fact actually exists.  See

1   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

2   establish the existence of such a factual dispute, the opposing party may not rely upon the

3   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

4   form of affidavits, and/or admissible discovery material, in support of its contention that the

5   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

6   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

7   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

8   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

9   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

10  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

11  1436 (9th Cir. 1987).

12          In the endeavor to establish the existence of a factual dispute, the opposing party

13  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

14  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

15  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

16  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

17  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

18  committee's note on 1963 amendments).

19          In resolving a summary judgment motion, the court examines the pleadings,

20  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

21  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

22  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

23  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

24  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

25  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

26  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

1   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

2   show that there is some metaphysical doubt as to the material facts . . .  Where the record taken

3   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

4   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

5   III.  Legal Standard for Eighth Amendment Claim

6               Generally, deliberate indifference to a serious medical need presents a cognizable

7   claim for a violation of the Eighth Amendment's prohibition against cruel and unusual

8   punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511

9   U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison

10  official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that

11  risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is

12  less stringent in cases involving a prisoner's medical needs than in other cases involving harm to

13  incarcerated individuals because 'the State's responsibility to provide inmates with medical care

14  ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974

15  F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled

16  on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

17  Specifically, a determination of "deliberate indifference" involves two elements:  (1) the

18  seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to

19  those needs.  McGuckin, 974 F.2d at 1059.

20              First, a "serious" medical need exists if the failure to treat a prisoner's condition

21  could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id.

22  (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

23  medical attention include the existence of an injury that a reasonable doctor or patient would find

24  important and worthy of comment or treatment; the presence of a medical condition that

25  significantly affects an individual's daily activities; or the existence of chronic and substantial

26  pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

4

1   (9th Cir. 1990)).

2          Second, the nature of a defendant's responses must be such that the defendant

3   purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for

4   "deliberate indifference" to be established.  McGuckin, 974 F.2d at 1060.  Deliberate

5   indifference may occur when prison officials deny, delay, or intentionally interfere with medical

6   treatment, or may be shown by the way in which prison physicians provide medical care."

7   Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate

8   indifference to be established, there must first be a purposeful act or failure to act on the part of

9   the defendant and resulting harm.  See McGuckin, 974 F.2d at 1060.  "A defendant must

10  purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for

11  deliberate indifference to be established."  Id.  Second, there must be a resulting harm from the

12  defendant's activities.  Id.  The needless suffering of pain may be sufficient to demonstrate

13  further harm.  Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

14         Mere differences of opinion concerning the appropriate treatment cannot be the

15  basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996);

16  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to

17  treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v.

18  City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious

19  medical condition, even if some treatment is prescribed, may constitute deliberate indifference in

20  a particular case.  Id.

21         In order to defeat defendants' motion for summary judgment, plaintiff must

22  "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809

23  F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

24  excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S.

25  at 837).

26  ////

5

IV.  Qualified Immunity

        "'Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" Hunt v. County of Orange, 2012 WL 432297 at *7 (9th Cir. Feb. 13, 2012) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (internal alterations omitted).

        Although the court was once required to answer these questions in order, the United States Supreme Court has clarified that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." Pearson v. Callahan, 555 U.S. 223, 236 (2009).  In this regard, if a court decides that plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).  Likewise, if a court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court may end further inquiries concerning qualified immunity without determining whether the allegations in fact make out a statutory or constitutional violation. Pearson, 555 U.S. at 236–42.

        In resolving the question of qualified immunity, the court views the facts in the light most favorable to the plaintiff.  See Schwenk v. Hartford, 204 F.3d 1187, 1198 (9th Cir. 2009).

V.  Undisputed Facts

        At all relevant times, defendant Swingle was the Chief Medical Officer ("CMO") at HDSP.  (Dkt. No. 71-6 at 2.)  At all relevant times, defendant Miller was a Senior Registered

Nurse ("SRN") at HDSP.  (Dkt. No. 71-7 at 1.)  At all relevant times, defendant Medina was a licensed Physician's Assistant at HDSP.  (Dkt. No. 71-3 at 1.)  At all relevant times, defendant Bowers was a Psychiatric Technician ("Psych Tech") at HDSP.  (Dkt. No. 14 at 3.)  At all relevant times, defendant St. Laurent was a Senior Psych Tech at HDSP.  (Dkt. No. 71-5 at 1.)

Plaintiff was housed in the HDSP Administrative Segregation unit known as the Z Unit from May 2007, to July 2008.  (Dkt. No. 14 at 6.)  In July 2008, plaintiff was transferred to Corcoran State Prison ("Corcoran").  (Id. at 17.)  On or around November 3, 2008, plaintiff returned to the Z Unit at HDSP.  (Id.)

In June 2007, plaintiff had back surgery that caused nerve damage.  (Id. at 13.)  In July 2007, Gabapentin, twice daily, was prescribed to treat the pain caused by the nerve damage.  (Id.)

On January 6, 2008, plaintiff filed a grievance alleging that he did not receive his Gabapentin on January 1, 2008, and January 6, 2008.  (Id. at 42.)  In that grievance, plaintiff also alleged that "numerous" other times he did not receive his Gabapentin, usually in the mornings and on weekends.  (Id.)

On January 6, 2008, Nurse Clark responded to plaintiff's grievance at the informal level.  (Id.)  Nurse Clark responded that he had no control over what occurred when he was not working, but that he would discuss the issue with his supervisor.  (Id.)

In the beginning of 2008, defendant Miller's duties included scheduling nurses to deliver medications in the Z Unit.  (Dkt. No. 71-7 at 2.)

On February 26, 2008, defendant Miller interviewed plaintiff regarding his appeal from Nurse Clark's response to his informal level appeal.  (Id. at 2.)  At the time of the interview, defendant Miller supervised only Nurse Clark.  (Id.)

On March 5, 2008, Dr. Agyeman issued a decision partially granting plaintiff's first level appeal.  (Dkt. No. 14 at 44-45.)  In that response, Dr. Agyeman discussed defendant Miller's interview with plaintiff.  (Id. at 44.)  Dr. Agyeman stated that defendant Miller told

7

1    plaintiff, in part, "There is appropriate policy in effect for the distribution of medications.  Your

2    request that the nurses  be counseled and reprimanded is not granted as inmates do not dictate

3    disciplinary action against staff."  (Id.)

4           Plaintiff appealed the first level appeal decision by Dr. Agyeman to the second

5    level.  On April 30, 2008, defendant Swingle partially granted plaintiff's second level appeal.

6    (Id. at 48-49.)  In that decision, defendant Swingle stated that defendant Miller had explained to

7    plaintiff that "Z unit staff had been instructed on medication distribution and that there is already

8    policy in place regarding the distribution of medication."  (Id. at 48.)

9           At some time prior to plaintiff's transfer back to HDSP on November 3, 2008,

10   plaintiff had been prescribed Tramadol for gastro-intestinal pain.  (See Dkt. No. 98-3 at 14 (June

11   10, 2008 Progress Note from HDSP indicating plaintiff prescribed Tramadol); Dkt. No. 98-3

12   (July 30, 2008 entry in plaintiff's medical records from Corcoran indicating plaintiff prescribed

13   Tramadol).)  From November 4, 2008, through November 14, 2008, plaintiff received

14   Gabapentin but no Tramadol.  (Dkt. No. 14 at 61-64.)  Defendant Medina stopped plaintiff's

15   Tramadol prescription following plaintiff's initial return to HDSP.  (Dkt. No. 71-3 at 2.)

16          On November 5, 2008, plaintiff filed a grievance alleging that he was not

17   receiving the medications that had been ordered at Corcoran, including: 1) Tramadol, 50 mg four

18   times a day; 2)  Ensure in the morning and a supplemental p.m. snack; 3) double mattress and

19   cervical wedge.  (Dkt. No. 14 at 54.)

20          In November of 2008, psych techs were only responsible for passing out

21   medications to inmates in administrative segregation units.  (Dkt. No. 71-5 at 1-2.)  Psych techs

22   could only pass out medications in the manner prescribed by a licensed medical provider.  (Id. at

23   2.)

24          On November 10, 2008, plaintiff went "man down," complaining of stomach

25   pain.  (Dkt. No. 14 at 62.)  Plaintiff was placed in a holding cage to wait for treatment.  (Id.)

26   While plaintiff was in the holding cage, defendant Bowers told plaintiff that his Tramadol order

had been found and that he would receive it the next day.  (Id.)

On November 10, 2008, plaintiff was informed that defendant Medina had stopped plaintiff's Tramadol prescription.  (Dkt. No. 14 at 63.)  On November 11, 2008, plaintiff went on a hunger strike to protest the discontinuation of the Tramadol.  (Id.)

On November 14, 2008, defendant Medina reinstated plaintiff's Tramadol prescription for 50 mg twice a day, rather than 50 mg four times a day as requested by plaintiff, until he could examine plaintiff.  (Dkt. No. 71-3 at 3.)  Plaintiff then ended his hunger strike. (Dkt. No. 14 at 63.)

On December 1, 2008, defendant Medina interviewed  plaintiff.  (Id. at 70.) Defendant Medina denied plaintiff's request to increase the Tramadol prescription as well as plaintiff's request for a snack.  (Id.)

On December 9, 2008, Dr. Nepomuceno partially granted plaintiff's appeal at the first level.  (Id. at 57-57.)  Dr. Nepomuceno stated that, according to defendant Medina, all of plaintiff's medications, including Ensure, were current.  (Id. at 56.)  Dr. Nepomuceno also stated that plaintiff's cervical pillow was on order.  (Id.)

On or around December 16, 2008, plaintiff filed an appeal of Dr. Nepomuceno's order to the second level of review.  In this appeal, plaintiff claimed that his prescribed medications were not current.  (Id. at 58.)  Plaintiff claimed that defendant Medina improperly ordered that he receive Tramadol only twice a day, contrary to the order by the doctors at Corcoran that he receive it four times a day.  (Id.)  Plaintiff alleged that he needed Tramadol four times a day to control the pain.  (Id.)   Plaintiff also claimed that his Ensure was delivered only half the time it should have been.  (Id.)

On January 13, 2009, defendant Swingle partially granted plaintiff's appeal.  (Id. at 70-71.)  Defendant Swingle stated that he concurred with plaintiff's current prescription of Tramadol and that the dose would not be increased.  (Id. at 71.)  Defendant Swingle also stated that plaintiff's nutritional supplement was prescribed at one can twice daily and that medical staff

1   at Z unit were contacted to insure that plaintiff receive this supplement twice daily.  (Id.)

2            After numerous tests, it was determined that plaintiff suffered from irritable bowel

3   syndrome.   (Dkt. No. 14 at 8.)

4            When plaintiff returned to HDSP in November 2008, defendant Miller's duties no

5   longer included scheduling nurses to deliver medications in Z Unit.[1]  (Dkt. No. 71-7 at 3.)

6   VI.  Discussion

7          A.  Defendant Miller

8            Plaintiff alleges that he did not receive his medications while housed in the Z Unit

9   at HDSP because defendant Miller failed to adequately train the nurses she supervised regarding

10   medication distribution policies and procedures.  (Dkt. No. 14 at 10.)  Plaintiff also alleges that

11   defendant Miller failed to implement and enforce adequate medication distribution policies.  (Id.)

12   Because the amended complaint also includes numerous allegations that plaintiff did not receive

13   his medication due to the understaffing of nurses, the undersigned construes plaintiff to be

14   alleging a claim against defendant Miller for understaffing nurses.

15            Defendants argue that defendant Miller should be granted summary judgment

16   because plaintiff is basing Miller's liability on a theory of respondeat superior.

17

18        [1]  In his opposition, plaintiff claims that defendant Miller was responsible for scheduling nurses to deliver medication when he returned to HDSP in November 2008.  Plaintiff argues that in response to several discovery requests, defendant Miller stated that she worked as a Supervising Nurse in the Z Unit during this period of time.  Plaintiff cites defendant Miller's responses to interrogatory no. 1 and request for admissions nos. 52 and 53.  Interrogatory no. 1 asked defendant Miller to identify the positions and dates of employment she held as an employee at any state prison.  (Dkt. No. 98-5 at 4.)  In response to this interrogatory, defendant Miller stated that from November 2005 to May 2009, she worked as an SRN II at HDSP.  (Id. at 5.)  Defendant Miller also stated that as an SRN II, she was assigned to the Z Clinic and other areas.  (Id.)

       In response to request for admission no. 52, defendant Miller denied that as of April 3, 2009, she no longer had any responsibilities concerning Z Unit.  (Id. at 14.)  In response to request for admission no. 53, defendant Miller denied that as of April 3, 2009, an SRN II other than her was responsible for Z Unit.  (Id. at 14-15.)

       Defendant Miller's responses to plaintiff's discovery requests indicate that she continued to work in the Z Unit as an SRN II during the second period of time plaintiff was housed there.  However, these responses do not overcome defendant Miller's statement in her declaration that she was no longer in charge of scheduling nurses to deliver medications.

1        The Civil Rights Act under which this action was filed provides as follows:

2        Every person who, under color of [state law] . . . subjects, or causes
to be subjected, any citizen of the United States . . . to the

3        deprivation of any rights, privileges, or immunities secured by the
Constitution . . . shall be liable to the party injured in an action at

4        law, suit in equity, or other proper proceeding for redress.

5  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

6  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

7  Monell v. Department of Social Servs., 436 U.S. 658, 692 (1978) ("Congress did not intend

8  § 1983 liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976)

9  (no affirmative link between the incidents of police misconduct and the adoption of any plan or

10  policy demonstrating their authorization or approval of such misconduct).  "A person 'subjects'

11  another to the deprivation of a constitutional right, within the meaning of  § 1983, if he does an

12  affirmative act, participates in another's affirmative acts or omits to perform an act which he is

13  legally required to do that causes the deprivation of which complaint is made."  Johnson v.

14  Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

15        Moreover, supervisory personnel are generally not liable under § 1983 for the

16  actions of their employees under a theory of respondeat superior and, therefore, when a named

17  defendant holds a supervisorial position, the causal link between him and the claimed

18  constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

19  (9th Cir. 1979) (no liability where there is no allegation of personal participation); Mosher v.

20  Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979) (no liability where

21  there is no evidence of personal participation).  Vague and conclusory allegations concerning the

22  involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board

23  of Regents, 673 F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of

24  personal participation is insufficient).

25        Supervisors  "can be held liable for: 1) their own culpable action or inaction in the

26  training, supervision, or control of subordinates; 2) their acquiescence in the constitutional

1  deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous

2  indifference to the rights of others."  Cunningham v. Gates, 229 F.3d 1271, 1292 (9th Cir. 2000)

3             Regarding the first period of time plaintiff was housed in the Z Unit, prior to his

4  transfer to Corcoran, defendants argue that plaintiff has failed to establish a causal link between

5  defendant Miller and the alleged inadequacies of medication distribution in Z Unit.  Defendants

6  argue that defendant Miller was never personally responsible for delivering plaintiff's

7  medications in January 2008.  Defendants argue that defendant Miller's only interaction with

8  plaintiff occurred when she interviewed him on February 26, 2008, regarding his grievance

9  alleging that his medications were not being delivered.  Defendants argue that defendant Miller

10  did not supervise the employees who allegedly failed to deliver the medications on the two times

11  alleged in the grievance filed in January 2008.   In her declaration filed in support of the

12  summary judgment motion, defendant Miller states in relevant part,

13             2.  In 2008, I became a Supervising Registered Nurse II (SRN II).
14         As an SRN II, I supervised a small group of nurses.  The Director
           of Nursing was my supervisor and the primary supervisor of the
           nurses and the psyche techs.
15
16             3.  In the beginning of 2008, I was in charge of scheduling nurses
           to deliver medications in Z unit.  An office technician would make
17         the schedule based on the nurses' standard set schedule.  Once the
           office technician completed the schedule, I would review the
18         schedule to ensure that everything was correct.  I was only at
           HDSP from nine in the morning until around five at night, and I
19         did not work weekends.  If a nurse were absent when I was not at
           the prison, the lead nurse at the time would alter the schedule
20         accordingly.  The lead nurse had no set guidelines in altering the
           schedule.
21
               4.  Z Unit is one of HDSP's Administrative Segregation units, and
22         in 2008 both nurses and psyche techs were responsible for
           delivering medications to inmates in Z unit.  In Z unit, nurses were
23         responsible for delivering medications in the morning and up until
           two o'clock.  After two o'clock psyche techs were responsible for
24         delivering medications.  I was not responsible for scheduling
           psyche techs.
25
               5.  On February 26, 2008 I interviewed Michael Baker with respect
26         to his 602 inmate appeal (HDSP-Z-08-00140).  In his appeal, Mr.
           Baker complained that staff had failed to deliver his medications

1    on the mornings of January first and sixth of 2008.

2        6.  In responding to Mr. Baker's appeal, I informed him that I had
3        no control over what occurs at HDSP when I was not there.  I told
         him that I did not know who was not delivering his medications as
         prescribed, but that I would talk to my supervisors about his
4        problems.  At the time of the interview, I only supervised R.N.
         John Clarke.  Mr. Baker told me that he did not have problems
5        receiving his medications when R.N. Clarke was on duty. I
         informed Mr. Baker that Z unit staff had  been properly instructed
6        on medication distribution, and that he needed to contact me if this
         problem persisted.  Mr. Baker informed me that he had been
7        receiving his medications as prescribed since filing this appeal.

8        7.  In August of 2008, my husband became ill and I took a leave of
         absence to care for him. When I returned to HDSP, another SRNII
9        was in charge of scheduling nurses to deliver medications.
         Therefore in November of 2008, I was no longer in charge of
10       scheduling nurses to deliver medications.

11   (Dkt. No. 71-7 at 1-3.)

12       The undersigned first considers plaintiff's claim that he did not receive his

13   medication  during the first period of time he was housed in Z Unit based on defendant Miller's

14   alleged failure to train the nurses she supervised.

15       At the outset, the undersigned observes that defendant Miller does not claim that

16   her duties did not include training her subordinates regarding the medication distribution policies

17   in the Z Unit.  Rather, defendants argue that plaintiff has not demonstrated that an employee

18   supervised by defendant Miller failed to deliver plaintiff's medication.

19       For the following reasons, the undersigned finds that defendant Miller has not

20   made a sufficient showing that she was not responsible for training any of the nurses who

21   allegedly failed to deliver plaintiff's medication during the first period of time he was housed in

22   the Z unit.  In her declaration, defendant Miller states that *at the time she interviewed* plaintiff on

23   February 26, 2008, she only supervised Nurse Clarke.  However, in the appeal, plaintiff alleged

24   that he did not receive his medications on January 1, 2008, and January 6, 2008.  In addition,

25   when defendant Miller interviewed plaintiff on February 26, 2008, plaintiff told defendant Miller

26   that he had not received his medication on February 1-4, 2008.  (Dkt. No. 14 at 44.) Defendant

13

1    Miller's declaration does not address whether she was responsible for training or supervising any

2    of the nurses who allegedly failed to provide plaintiff with his medications on those other dates.

3              In addition, whether Nurse Clark properly delivered plaintiff's medications is

4    disputed.  In her declaration, defendant Miller states that plaintiff told her that he had no

5    problems with Nurse Clark delivering his medications.  In contrast, in his response to plaintiff's

6    first level appeal, Dr. Agyeman states that plaintiff told defendant Miller that the last time he did

7    not receive his medications was on February 1-4, 2008, but since that time he had been receiving

8    his medication when Nurse Clark was not on the unit.  (Id.)  This statement by Dr. Agyeman

9    suggests that Nurse Clark did not adequately deliver plaintiff's medication.  Based on these

10   inconsistencies, the undersigned finds that whether Nurse Clark, whom defendant Miller

11   supervised and apparently trained, properly delivered plaintiff's medication is a materially

12   disputed material fact.

13             The nature and extent of plaintiff's trouble in receiving his medication is also a

14   materially disputed material fact.  Defendants argue that the record demonstrates that plaintiff

15   had no problems receiving his medication after he filed his appeal on January 6, 2008.  However,

16   Dr. Agyeman states that plaintiff told defendant Miller that the last time he did not receive his

17   medications was February 1-4, 2008.  (Id.)  In the amended complaint, plaintiff alleges that on

18   February 4, 2008, he saw Dr. Leppla, who had some involvement with the back surgery.  (Id. at

19   15.)  Plaintiff alleges that when informed that plaintiff had gone for over 60 hours without his

20   Gabapentin, Dr. Leppla wrote a letter to the HDSP medical department stating that plaintiff

21   should receive his pain medication in order to avoid further surgery.  (Id.)  In the amended

22   complaint, plaintiff further alleges that he did not receive his medications on April 26, 2008, May

23   18, 2008, and on two occasions in June 2008.  (Id. at 6, 11, 17.)

24             For the reasons discussed above, the undersigned finds that defendant Miller is

25   not entitled to summary judgment based on her argument that plaintiff did not adequately link her

26   to his claim that she did not adequately train the nurses she supervised regarding medication

1  distribution policies.

2          Defendants argue that defendant Miller should be granted qualified immunity as

3  to this claim.  It is difficult to analyze this claim for qualified immunity based on the

4  undeveloped record and disputed facts.  However, taking the facts in the light most favorable to

5  plaintiff, the undersigned finds that defendant Miller violated plaintiff's Eighth Amendment

6  rights by failing to adequately train the nurses she supervised regarding the medication

7  distribution policies.  The undersigned further finds that a reasonable supervising nurse would

8  have known that failing to perform their duty to adequately train the nurses they supervised

9  regarding medication policies would result in a violation of an inmate's constitutional rights.

10  Accordingly, defendant Miller is not entitled to qualified immunity as to this claim.

11          The undersigned also observes that defendants' summary judgment motion does

12  not address plaintiff's claim that he did not consistently receive his pain medication during the

13  first period of time he was housed in the Z Unit because defendant Miller did not schedule

14  enough nurses to distribute the medication.   In the amended complaint, plaintiff alleges that he

15  did not receive Gabapentin on February 1, 2008 because the p.m. nurse did not conduct rounds.

16  (Dkt. No. 14 at 14.)  Plaintiff alleges that he did not receive Gabapentin on February 2, 2008,

17  because the a.m. and p.m. nurses did not conduct rounds.  (Id. at 15.)  Plaintiff alleges that on

18  February 3, 2008, he did not receive Gabapentin because the a.m. nurse did not conduct rounds.

19  (Id.)

20          In her declaration, defendant Miller claims that she had no control over nurse

21  absenteeism.  However, defendant Miller does not address whether the nurses who failed to

22  conduct their rounds, as alleged by plaintiff, did so due to absenteeism or due to inadequate

23  training or scheduling.  For this reason,  the undersigned cannot find that defendant Miller is

24  entitled to summary judgment as to this claim.

25          Plaintiff next alleges that he did not receive his medication during the second

26  period of time he was housed at HDSP due to defendant Miller's failure to adequately train the

1   nurses she supervised regarding medication distribution.  Defendant Miller moves for summary

2   judgment as to this claim on grounds that during this time she was no longer in charge of

3   scheduling nurses to deliver medications.  As set forth above, it is undisputed that defendant

4   Miller no longer scheduled nurses to deliver medication on the Z Unit when plaintiff returned to

5   HDSP in November 3, 2008.

6          To the extent plaintiff is claiming that he did not receive his medication because

7   defendant Miller did not schedule enough nurses to distribute medication, defendant Miller is

8   entitled to summary judgment.  However, while defendant Miller may no longer have been

9   responsible for scheduling nurses, it is not clear that she was no longer responsible for

10  supervising and training nurses who distributed medication.[2]  Because defendant Miller does not

11  address plaintiff's claim that she failed to adequately train the nurses she supervised during the

12  second period of time he was housed in the Z Unit, defendant Miller should not be granted

13  summary judgment as to this claim.

14          B.  Defendant Medina

15          Defendants move for summary judgment as to plaintiff's claims alleging that

16  defendant Medina 1) failed to prescribe Tramadol when plaintiff first returned to HDSP in

17  November 2008; and 2) prescribed Tramadol at a dose less than that ordered by the doctors at

18

19          [2]  In the amended complaint plaintiff alleges, as will be discussed infra, that he did not
    *initially* receive Tramadol following his return to HDSP based on orders by defendant Medina.
20  The record is clear that defendant Miller did not supervise defendant Medina.  Therefore,
    plaintiff cannot claim that he was denied Tramadol during this period of time based on defendant
21  Miller's alleged failure to train her subordinates regarding the medication distribution policy.
    However, plaintiff goes on to allege that he later had problems receiving his medications.  For
22  example, plaintiff alleges that on December 7, 2008, he did not receive his noon Tramadol.  (Dkt.
    No. 14 at 22.)  Plaintiff alleges that from December 22, 2008, through December 29, 2008, he
23  had difficulty receiving his medication and Ensure.  (Id. at 23.)  On January 16, 2009, plaintiff
    alleges that no morning or noon medication rounds were conducted.  (Id. at 24.)  On January 20,
24  2009, plaintiff allegedly did not receive his noon Tramadol.  (Id.)  The amended complaint goes
    on to list other dates that plaintiff allegedly did not receive his medications.  While plaintiff's
25  difficulty in receiving his medications during these times may have been caused by factors
    unrelated to defendant Miller's alleged failure to train her subordinates regarding medication
26  distribution policies, this matter is not addressed in defendants' summary judgment motion.

1  Corcoran.

2  *Failure to Prescribe Tramadol Upon Plaintiff's Return to HDSP*

3  Defendants first argue that defendant Medina did not act with deliberate

4  indifference when he failed to prescribe Tramadol for plaintiff when plaintiff initially returned to

5  HDSP on November 3, 2008.  It is undisputed that plaintiff did not receive Tramadol from his

6  arrival at HDSP on November 3, 2008, to November 14, 2008, based on defendant Medina's

7  orders.

8  At the outset, the undersigned finds that it is clear from the record that plaintiff's

9  gastro-intestinal problems, later diagnosed as Irritable Bowel Syndrom, constituted a serious

10  medical need.  The record demonstrates that this condition caused plaintiff to suffer great pain

11  for which he was prescribed pain medication, i.e., Tramadol.

12  Defendants argue that defendant Medina did not act with deliberate indifference to

13  plaintiff's serious medical need by failing to prescribe Tramadol because in defendant Medina's

14  opinion, plaintiff did not require this pain medication.  In support of this argument, defendants

15  refer to defendant Medina's declaration:

16  5.  Tramadol is a non-narcotic pain killer which is not usually used
for gastro intestinal pain.  Even though Tramadol is a non narcotic,
17  it does offer some narcotic effects.  Tramadol is most commonly
prescribed for broken bones and muscular skeleton pains.
18  Tramadol does not usually have any adverse side effects, however
it can be related to nausea, tremor, dizziness or seizure.  None of
19  which Baker alleges he suffered.

20  6.  I initially stopped Baker's prescription for Tramadol in
November of 2008, because I could not find any objective medical
21  evidence that Baker should be prescribed any additional pain
medications on top of his gabapentin prescription.  In my medical
22  opinion as a licensed physician's assistant, it was not medically
necessary for Baker to need both Tramadol and gabapentin, as both
23  are pain killing medications.  Since Tramadol is not a drug
commonly used for gastro intestinal pain, I thought it was
24  inappropriate to prescribe Inmate Baker Tramadol at the time.

25  7.  In November of 2008, I was extremely familiar with Baker's
medical history as I had performed a lot of examinations of him in
26  the months prior to him leaving for the Corcoran Security Housing

17

Unit.  I had previously seen Baker several times for abdominal pain, and I had ordered an MRI of his abdomen just before he left for Corcoran.  This MRI showed no issues, with his intestines, other than a possible gall bladder polyp.  Exhibit A.  Furthermore, this MRI could not account for any of Baker's symptoms.

8.  As a licensed physician's assistant I do not believe in over medicating my patients.  Additionally, even though Tramadol is a non-narcotic pain killer, it can have some opiodic euphoric side effects similar to narcotic pain killing drugs such as vicodin.  Since Tramadol can offer some slight euphoric side effects, I am cautious to prescribe it, as inmates seeking a pecuniary gain commonly request it.

9.  On November 14, 2008, after speaking with some of the medical staff, I decided to prescribe Baker two 50-milligram pills of Tramadol a day.  I did not order four 50 milligram pills of Tramadol as Baker had requested because I did not believe that four pills a day were medically necessary.

10.  On December 5, 2008, I examined Baker at medical clinic for his complaints of gastro intestinal pain and discomfort.  At this appointment. Dr. Nepomuceno and I decided to order that Baker go through some additional testing to see what was causing the gastro intestinal pain and discomfort.  In addition to ordering the additional testing for Baker, I continued his Tramadol prescription as he stated that it had a good effect at helping him with his pain and discomfort.  Exhibit A.

(Dkt. No. 71-3 at 2-3.)

Plaintiff has presented evidence that prior to his return to HDSP in November 2008, he was prescribed Tramadol at both HDSP and Corcoran.  Regarding his receipt of Tramadol at HDSP, plaintiff has provided a copy of a Progress Note prepared by defendant Medina on June 10, 2008, stating that plaintiff's prescription for Tramadol 50 mg. twice a day would continue.  (Dkt. No. 98-3 at 14.)   In his opposition, plaintiff alleges that on July 30, 2008, Dr. Wang at Corcoran increased his Tramadol dose to 50 mg. four times a day.  (Dkt. No. 98 at 43.)  Plaintiff has provided a copy of Dr. Wang's entry in his medical records.  (Dkt. No. 98-3.)  While Dr. Wang's notes clearly reference a prescription for Tramadol, the undersigned cannot determine the dosage ordered.

Based on this record, the undersigned cannot find that as a matter of law,

1   defendant Medina did not act with deliberate indifference by failing to prescribe Tramadol.  The

2   record indicates that in making his decision to deny plaintiff Tramadol, defendant Medina failed

3   to consider orders from Dr. Wang, a medical doctor at Corcoran, that plaintiff receive Tramadol.

4   The June 10, 2008 Progress Note prepared by defendant Medina indicates his awareness of

5   plaintiff's previous prescription for Tramadol.  While the Progress Note does not mention

6   Gabapentin, the record indicates that when plaintiff returned to HDSP in November 2008, he had

7   prescriptions for both Gabapentin and Tramadol, which had been prescribed together at both

8   HDSP and Corcoran.  The record does not explain why defendant Medina, a physician's

9   assistant, substituted his own judgment regarding plaintiff's need for Tramadol over that of

10  medical doctors.

11          Defendants suggest that defendant Medina did not act with deliberate indifference

12  because plaintiff was denied Tramadol for "only" ten days.  However, plaintiff alleges that he

13  suffered great pain during those ten days.  Plaintiff went on a hunger strike during that time to

14  protest his failure to receive Tramadol.  Plaintiff alleges that he went "man down" on November

15  6, 2008, and November 10, 2008, because of gastro-intestinal pain.  (Dkt. No. 14 at 18-19.)  The

16  record demonstrates that plaintiff's claim of pain during these ten days was credible.  Based on

17  this record, defendants' argument that defendant Medina did not act with deliberate indifference

18  because plaintiff was denied Tramadol for "only" ten days is without merit.

19          For the reasons discussed above, the undersigned finds that defendant Medina is

20  not entitled to summary judgment as to this claim.

21          The undersigned now turns to the issue of qualified immunity.  Based on the

22  record discussed above, the undersigned finds that taking the facts in the light most favorable to

23  plaintiff, defendant Medina violated plaintiff's Eighth Amendment right to adequate medical care

24  by failing to prescribe Tramadol for plaintiff upon his return to HDSP.  See Sorrels v. McKee,

25  290 F.3d 965, 969 (9th Cir. 2002) (the first prong of the qualified immunity analysis "mirrors the

26  substantive summary judgment decision on the merits.")

19

1    Turning to the second element of qualified immunity, the undersigned next

2    considers whether plaintiff's rights were clearly established.  As discussed above, a prison

3    official "violates clearly established law when, at the time of the challenged conduct, 'the

4    contours of the right are sufficiently clear' that 'every reasonable official would have understood

5    that what he is doing violates that right.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)

6    (internal citations omitted).

7    Plaintiff's Eighth Amendment right to adequate medical care clearly included the

8    right to adequate pain medication.  Defendants do not and cannot argue otherwise.  Based on the

9    record, the undersigned finds that a reasonable prison official would have known that failing to

10   prescribe Tramadol for plaintiff upon his return to HDSP violated plaintiff's Eighth Amendment

11   rights.  As discussed above, when plaintiff returned to HDSP, he had been receiving Tramadol

12   for gastro-intestinal pain for some time.  The record indicates that prior to his transfer to

13   Corcoran, prison officials at HDSP, including defendant himself, had prescribed Tramadol.

14   Arguably, a reasonable physician's assistant would not have substituted his own judgment for

15   that of medical doctors at two prisons regarding plaintiff's need for this pain medication.

16   Accordingly, defendant Medina is not entitled to qualified immunity as to this claim.

17                    *Failure to Prescribe Tramadol Four Times Per Day*

18   The undersigned next considers whether defendant Medina is entitled to qualified

19   immunity as to plaintiff's claim that Medina acted with deliberate indifference to plaintiff's

20   serious medical needs when Medina prescribed Tramadol 50 mg. twice a day rather than four

21   times a day, as had been previously ordered by the doctors at Corcoran.  For the following

22   reasons, the undersigned finds that  defendant Medina is entitled to qualified immunity as to this

23   claim because a reasonable official would *not* have understood that failing to prescribe Tramadol

24   50 mg. four times a day rather than twice a day violated plaintiff's constitutional rights.  Pearson,

25   555 U.S. at 236–42 (court has discretion to first consider whether right was clearly established in

26   considering qualified immunity.)

1    As discussed above, plaintiff claims that Dr. Wang at Corcoran had prescribed

2 Tramadol 50 mg. four times a day.  In a progress note dated December 5, 2008, defendant

3 Medina states that he examined plaintiff.  (Dkt. No. 71-4 at 2.)  At the time of this examination,

4 plaintiff was not receiving Tramadol.  At this examination, plaintiff told defendant Medina that

5 he had been taking Tramadol and that it had helped the pain.  (Id.)  Defendant Medina stated that

6 plaintiff had a GI consult (with Dr. Harrison) on May 1, 2008.  (Id.)  Defendant Medina

7 continues,

8           At that time Dr. Harrison stated the patient should have an EED, a
            colonoscopy as well as a CTK with a .... .  I discussed these results
9           with Dr. Nepomuceno and we are going to go ahead and proceed
            with the ... and the CTK challenge.  Tx/Rx – the patient will be
10          given an additional dose of Tramadol as Dr. Harrison recommends
            t.i.d. dosage of Tramadol and we will follow his recommendation.

11

12 (Id.)

13    In determining that plaintiff should receive Tramadol twice a day rather than four

14 times a day, defendant Medina relied on a recommendation by Dr. Harrison made following the

15 GI consultation on May 1, 2008.[3]

16    Even assuming that defendant Medina was aware that a doctor at Corcoran had

17 prescribed Tramadol 50 mg. four times a day, defendant Medina did not act unreasonably in

18 relying on the recommendation of Dr. Harrison, the gastro-intestinal specialist, that plaintiff

19 receive Tramadol 50 mg. twice a day.  Although Dr. Harrison saw plaintiff in May, i.e., prior to

20 his transfer to Corcoran, Dr. Harrison was a gastro-intestinal specialist.  According to plaintiff,

21 Dr. Wang, the Corcoran doctor who allegedly ordered plaintiff receive Tramadol 50 mg four

22 times a day, made this order during an "intake" examination of plaintiff upon his arrival at

23

24    [3]  A copy of Dr. Harrison's report prescribing Tramadol 50 mg. twice daily is attached to
plaintiff's opposition.  (Dkt. No. 98-3 at 27.)  In his opposition, plaintiff claims that Dr. Harrison
25 ordered Tramadol 3 to 4 times a day.  (Dkt. No. 98 at 35.)  While the undersigned has located Dr.
Harrison's report recommending that plaintiff receive Tramadol twice a day, he cannot locate a
26 report by Dr. Harrison recommending that plaintiff receive Tramadol three to four times per day.

1   Corcoran.[4]  (See Dkt. No. 98-3 at 15 (Dr. Wang's notes of intake examination).)  From this

2   record, it appears that Dr. Wang was not a gastro-intestinal specialist.  It also appears that

3   defendant Medina determined that plaintiff should receive Tramadol 50 mg. twice a day after

4   consulting with Dr. Nepomuceno at HDSP.

5          Under the  circumstances described above, a reasonable physician's assistant

6   would not have thought that prescribing Tramadol, 50 mg twice a day violated plaintiff's

7   constitutional rights.  Accordingly, defendant Medina is entitled to qualified immunity as to this

8   claim.

9          The undersigned also observes that in the amended complaint, plaintiff alleges

10  that on December 5, 2008, Nurse Clark told plaintiff that Dr. Nepomuceno had reviewed

11  plaintiff's chart and increased his Tramadol to three times a day.  (Dkt. 14 at 21.)  The

12  undersigned cannot locate a medical record supporting this claim.  However, even assuming Dr.

13  Nepomuceno later increased plaintiff's dose of Tramadol, the undersigned would still find that

14  defendant Medina is entitled to qualified immunity for the reasons discussed above.

15                 *Unaddressed Claims*

16         In the amended complaint, plaintiff also alleges that defendant Medina violated

17  his Eighth Amendments rights by lying about re-ordering his medications and by interfering with

18  prescriptions ordered by Dr. Nepomuceno.  (Dkt. No. 14 at 34-35.)  The amended complaint

19  includes allegations to support this claim.  For example, plaintiff alleges that on December 3,

20  2008, defendant Medina told plaintiff that he had re-ordered plaintiff's prescription for Ensure

21  for twice a day.  (Id. at 21.)  On December 10, 2008, Nurse Harwood allegedly refused to give

22  plaintiff his Ensure because there was no "MAR" for it.  (Id. at 22.)  During morning rounds on

23  December 13, 2008, Nurse Bryant allegedly stated that there was no order for Ensure.  (Id.)

24  _____

25      [4]  Dr. Wang's handwriting on this order is difficult to read.  While Dr. Wang made an
    order regarding Tramadol, the dosage is not clearly legible.  (Dkt. 98-3 at 15.)  For purposes of
    this summary judgment motion, the undersigned will accept plaintiff's assertion that Dr. Wang

26  ordered Tramadol 50 mg. four times a day.

1   Plaintiff did not receive Ensure on December 14-18, 2008.  (Id.)  On December 17, 2008,

2   defendant Medina allegedly told plaintiff that the problem was "fixed" and he would re-order all

3   of plaintiff's meds.  (Id.)  Plaintiff continued to have problems receiving the Ensure.  (Id. at 22-

4   26.)  In the amended complaint, plaintiff also alleges that he had trouble obtaining his pain

5   medication consistently in 2009.  Plaintiff alleges that this trouble was caused, in part, by

6   defendant Medina's failure to renew his medication prescriptions.

7           The undersigned will not address the claims described above any further as they

8   are not addressed in defendants' summary judgment motion.

9                   C.  Defendant Swingle

10          Plaintiff alleges that he did not receive his medications while housed in the Z Unit

11  at HDSP because defendant Swingle failed to adequately train and supervise the nursing staff.

12  (Dkt. 14 at 10-11, 30-31.)  Plaintiff also alleges that defendant Swingle failed to implement and

13  enforce adequate medication distribution policies.  (Id.)  Plaintiff also alleges that defendant

14  Swingle caused him to suffer withdrawal symptoms from Tramadol.  (Id. at 31.)

15          Defendants move for summary judgment as to defendant Swingle on grounds that

16  plaintiff is basing his liability on the theory of respondeat superior.  Defendants argue that

17  plaintiff has not established facts demonstrating a link between Swingle and the alleged

18  deprivations.

19          In his declaration submitted in support of the summary judgment motion,

20  defendant Swingle states that as the CMO, he did not oversee medication administration.  (Dkt.

21  No. 71-6 at 2.)  He also states that the Director of Nurses is responsible for medication

22  administration.  (Id.)  Medication administration includes delivering medication to patients as

23  prescribed by their medical providers.  (Id.)  Nurses and psychiatric technicians are not under the

24  supervision of the CMO.  (Id.)  Nurses are under the supervision of the Director of Nurses.  (Id.)

25          In his opposition, plaintiff argues that defendant Swingle is responsible for

26  medication distribution policies and overseeing the training of nurses and psych techs.  In support

1  of this claim, plaintiff cites several documents attached to his Exhibits J and K.

2          Exhibit J is a portion of the Inmate Medical Services Program Policies &

3  Procedures Manual. (Dkt. No. 98-4 at 38-64.) Exhibit K includes several documents discussing

4  medical policies and procedures at HDSP, including a copy of the Health Care Transfer Process

5  for HDSP. (Dkt. No. 98-4 at 66-109.) Plaintiff does not identify where in these 69 pages of

6  exhibits it states that the HDSP CMO establishes or implements medication distribution policies

7  or that the HDSP CMO is responsible for training nurses or psych techs.

8          Plaintiff is apparently asking the undersigned to review his Exhibits J and K for

9  him. It is not the undersigned's duty to comb through these exhibits on plaintiff's behalf. See

10  Jacobsen v. Filler, 790 F.2d 1362, 1364-66 (9th Cir. 1986) (holding that the court must remain a

11  "referee" in the adversarial process, and cannot serve as legal counsel for a party, even if that

12  party is a pro se litigant). The fact that plaintiff is representing himself and may not understand

13  the law well does not excuse him from following the same rules that apply to all other litigants.

14  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir.1987).

15          Plaintiff has not sufficiently demonstrated that defendant Swingle was responsible

16  for creating or implementing policies regarding medication distribution or that he was

17  responsible for supervising or training nurses and psych techs regarding medication distribution.

18  Accordingly, based on defendant Swingle's unopposed declaration, the undersigned finds that

19  these were not part of his duties as the HDSP CMO. Accordingly, defendant Swingle is entitled

20  to summary judgment as to these claims.[5]

21          Plaintiff also alleges that defendant Swingle is responsible for plaintiff's failure to

22  receive Tramadol upon his arrival at HDSP. Plaintiff also may be claiming that defendant

23  Swingle is responsible for his failure to obtain a prescription for Tramadol 50 mg. four times a

24

25          [5] While the undersigned accepts that defendant Swingle did not supervise the nurses or
   psych techs, it is therefore puzzling why defendant Swingle would review an administrative
   grievance raising concerns regarding the performance of nurses or psych techs. It would seem

26  that the Director of Nurses would be better suited to consider these claims.

1   day, rather than the two times a day, as prescribed by defendant Medina.

2           The record indicates that defendant Swingle's only involvement with plaintiff

3   regarding the Tramadol prescription following plaintiff's return to HDSP in November 2008, was

4   Swingle's response to plaintiff's inmate grievance.  As indicated in the statement of undisputed

5   facts, by the time defendant Swingle reviewed this grievance, plaintiff had been prescribed

6   Tramadol 50 mg. two times a day.  There is no evidence in the record linking defendant Swingle

7   to plaintiff's failure to obtain Tramadol from November 4, 2008, to November 14, 2008.

8   Accordingly, defendant Swingle should be granted summary judgment as to plaintiff's claim

9   concerning plaintiff's failure to receive Tramadol upon his return to HDSP in November 2008.

10          Regarding plaintiff's claim that he did not receive an adequate dosage of

11  Tramadol, it is undisputed that on January 13, 2009, defendant Swingle partially granted

12  plaintiff's appeal.  In the response to plaintiff's appeal, defendant Swingle stated that he

13  concurred with plaintiff's current prescription of Tramadol and that the dose would not be

14  increased.

15          In rejecting plaintiff's request for an increase in his Tramadol prescription,

16  defendant Swingle relied on the prescription ordered by defendant Medina.  As discussed above,

17  in making this prescription defendant Medina relied on the recommendation of Dr. Harrison, the

18  gastro-intestinal specialist, that plaintiff should receive Tramadol 50 mg. twice a day.  Therefore,

19  in concurring with defendant Medina regarding the proper Tramadol dose, defendant Swingle

20  also relied on Dr. Harrison's recommendation.  For the same reasons the undersigned found that

21  defendant Medina was entitled to qualified immunity as to this claim, the undersigned finds that

22  defendant Swingle is entitled to qualified immunity as well.

23          For the reasons discussed above, defendant Swingle should be granted summary

24  judgment as to all of plaintiff's claims.

25  ////

26  ////

1          D.  Defendants St. Laurent and Bowers

2              *Plaintiff's Allegations*

3              In order to put defendants' summary judgment motion in context as to defendants

4  St. Laurent and Bowers, the undersigned will summarize plaintiff's allegations against them as

5  set forth in the amended complaint.

6              Plaintiff alleges that on November 4, 2008, he told defendant Bowers that he had

7  not received his Tramadol.  (Dkt. No. 14 at 17.)  On the morning of November 5, 2008,

8  defendant Bowers brought plaintiff Gabapentin but not Tramadol.  (Id. at 18.)

9              On the morning of November 6, 2008, plaintiff told defendant Bowers that he was

10  "man down."  (Id.)  Plaintiff told defendant Bowers that he could not eat or sleep, his gut was

11  killing him, and that it hurt badly.  (Id.)  An Officer Brown said he would call someone.  (Id.)

12  Three hours later, plaintiff asked Officer Brown, "what's up, I need a doctor."  (Id.)  Officer

13  Brown replied, "He didn't come talk to you?"  (Id.)

14              On November 10, 2008, plaintiff went "man down."  (Id. at 19.)  Plaintiff was

15  taken to a holding cage to wait for treatment.  (Id.)  While plaintiff waited, defendant Bowers told

16  plaintiff, "they found your order for Tramadol and it will start tomorrow."  (Id.)  Later, Officer

17  Boutler or Haas told plaintiff that defendant St. Laurent refused to see him because "she had real

18  patients to treat."  (Id.)  As Officer Boutler and Haas helped plaintiff back to his cell, Officer

19  Boutler stated, "St. Laurent informed that Baker will get his stomach pills tomorrow."  (Id.)

20              *Analysis*

21              Plaintiff's claims against defendants Bowers and St. Laurent are based on their

22  alleged failure to treat his stomach pain.  Defendants move for summary judgment as to these

23  defendants on the grounds that they had no authority to provide plaintiff with Tramadol, which is

24  what he  was requesting on the dates discussed above.  It is undisputed that psych techs had no

25  authority to distribute medication other than that prescribed by a licensed medical provider.

26  Because plaintiff was not prescribed Tramadol during the dates in question, it is undisputed that

1   defendants had no authority to provide plaintiff with Tramadol.

2           In evaluating plaintiff's claims against defendants Bowers and St. Laurent, the

3   undersigned is primarily concerned with the dates on which plaintiff was "man down," i.e.,

4   November 6, 2008, and November 10, 2008.  On those dates, plaintiff was in great pain.

5   Defendant St. Laurent had no interaction with plaintiff on November 6, 2008.  While plaintiff

6   allegedly told defendant Bowers that he was in pain on November 6, 2008, it was Officer Brown

7   who allegedly took responsibility for finding medical care for plaintiff on that date.  Under these

8   circumstances, the undersigned cannot find that defendant Bowers or defendant St. Laurent acted

9   with deliberate indifference to plaintiff's serious medical needs on that date.

10           Plaintiff alleges that defendant St. Laurent refused to see him when he went "man

11   down" on November 10, 2008.  Plaintiff also suggests that defendant Bowers should have

12   provided him with medical treatment.  As discussed above, neither defendant was authorized to

13   provide plaintiff Tramadol on that day as it had not been prescribed.  In the summary judgment

14   motion, defendants also argue that neither St. Laurent nor Bowers were authorized to provide

15   plaintiff with other medical care on that date.  In support of this claim, defendants refer to

16   defendant St. Laurent's declaration:

17           6.  Whenever there is a medical emergency we call the emergency
        medical response team.  These teams are responsible for assessing
18           the inmates's condition, and deciding whether the inmate needs to
        be brought into the Correctional Treatment Center for further
19           medical treatment and evaluation.  Each yard has its own
        emergency medical response team that consists of nurses and
20           custody staff.   No Psych Techs are on any emergency medical
        response teams.

21

22   (Dkt. 71-5 at 2.)

23           In his opposition, plaintiff disputes defendant St. Laurent's claim that psych techs

24   were not on the emergency medical response team who responded to his "man down" on

25   November 10, 2008.  In support of this claim, plaintiff refers to Chapter 12 of the Inmate

26   Medical Services Program Policies & Procedures Manual.  (Dkt. No. 98-4.)  This chapter

1   outlines the policies for responding to medical emergencies.  Plaintiff does not identify which

2   portion of this chapter he relies on for his claim that psych techs are part of emergency medical

3   response teams.  However, this chapter does state that psychiatric technicians are qualified to act

4   as a First Responder to a medical emergency.  (Id. at 56 (definition of Health Care Staff).)

5   However, this chapter does not state that the HDSP Emergency Medical Response team that

6   responded to plaintiff's "man down" on November 10, 2008, included psych techs.

7           In any event, plaintiff's claim that defendant St. Laurent refused to provide him

8   with medical treatment is based on inadmissible hearsay.  Plaintiff alleges that Officer Boutler

9   told him that defendant St. Laurent would not treat him on November 10, 2008.  Only admissible

10  evidence may be considered in ruling on a motion for summary judgment.  Orr v. Bank of

11  America, 285 F.3d 764, 773 (9th Cir. 2002).  Because plaintiff's claim against defendant St.

12  Laurent is based on inadmissible hearsay evidence, defendant St. Laurent's motion for summary

13  judgment should be granted.

14          Plaintiff alleges that on November 10, 2008, while he was in the holding cage

15  waiting for medical treatment,  defendant Bowers told him that he would be receiving his

16  Tramadol the next day.  This allegation, standing alone, does not state a colorable Eighth

17  Amendment claim.  Merely informing plaintiff that he would receive Tramadol the next day does

18  not violate the Constitution.

19          Because the undersigned finds that defendants Bowers and St. Laurent should be

20  granted summary judgment on the merits of plaintiff's Eighth Amendment claims, no further

21  discussion of qualified immunity is required.

22              E.  State Law Claims

23          Defendants request that the court dismiss plaintiff's remaining state law claims.

24  Plaintiff alleges state law claims for negligence, gross negligence and violation of the California

25  Constitution prohibition against cruel and unusual punishment.  (Dkt. No. 14 at 36.)  Defendants'

26  argument is premised on the assumption that the undersigned has recommended that summary

1    judgment be granted as to all federal claims.

2           A district court may decline to exercise supplemental jurisdiction if it has

3    dismissed *all* claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); Sanford v.

4    MemberWorks, Inc., 625 F.3d 550, 561 (9th Cir. 2010). "'[I]n the usual case in which all

5    federal-law claims are eliminated before trial, the balance of factors to be considered under the

6    pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point

7    toward declining to exercise jurisdiction over the remaining state-law claims.'" Sanford, 625

8    F.3d at 561 (quoting Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988),

9    superseded on other grounds by statute as recognized in Fent v. Okla. Water Res. Bd., 235 F.3d

10   553, 557 (10th Cir. 2000)).

11          As discussed above, the undersigned has recommended that summary judgment

12   be denied as to some of plaintiff's federal constitutional claims made against defendants Miller

13   and Medina.  Under these circumstances, there may be supplemental jurisdiction to consider

14   plaintiff's state law claims against all defendants.

15          Title 28 U.S.C. § 1367(a) provides that, "in any civil action of which the district

16   courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all

17   other claims that are so related to claims in the action within such original jurisdiction that they

18   form part of the same case or controversy . . .."  Nonfederal claims are part of the same case or

19   controversy as federal claims when they "'derive from a common nucleus of operative fact' and

20   are such that a plaintiff 'would ordinarily be expected to try them in one judicial proceeding.'"

21   Trustees of Construction Industry and Laborers Health and Welfare Trust v. Desert Valley

22   Landscape & Maintenance, Inc., 333 F.3d 923, 925 (9th Cir. 2003) ( citing Finley v. United

23   States, 490 U.S. 545, 549 (1989)).

24          Where a plaintiff brings a state law claim against one defendant and a federal

25   claim against another, supplemental jurisdiction may be exercised over the state defendant so

26   long as the state and federal claims arise from a common nucleus of facts.  See Mendoza v.

1   Zirkle Fruit Co., 301 F.3d 1163, 1173–75 (9th Cir. 2002) (holding that the district court could

2   exercise supplemental jurisdiction over defendant employment agency, against which only a state

3   law claim was brought, because the state claim arose from the same nucleus of facts as the

4   federal RICO claim brought against employment agency's codefendant); see also Estate of

5   Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1164–65 (10th Cir. 2004)

6   (holding that the district court had supplemental jurisdiction over defendant Jackson Hole,

7   against which only a state wrongful death claim was brought, because the court had original

8   jurisdiction over the FTCA wrongful death claim brought against co-defendant United States,

9   and both claims arose from a common nucleus of facts). "In practice, § 1367(a) requires only that

10  the jurisdiction-invoking claim and the supplemental claim have some loose factual connection."

11  13D Wright & Miller, Federal Practice and Procedure § 3567.1 (3d ed. 2008).

12          Defendants' motion does not address whether plaintiff's state law claims arise

13  from a common nucleus of fact as the remaining federal claims.  Because this issue has not been

14  addressed by either party, defendants' motion for summary judgment as to plaintiff's state law

15  claims should be denied.

16          Accordingly, IT IS HEREBY RECOMMENDED that:

17          1.  Defendants' August 10, 2011 summary judgment motion (Dkt. No. 71) be

18  denied as to the following claims: 1) defendant Miller failed to adequately train the nurses she

19  supervised who distributed plaintiff's medication; 2) defendant Miller understaffed the Z Unit

20  nurses responsible for distributing medication during the first time plaintiff was housed on the Z

21  Unit; 3) defendant Medina failed to prescribe Tramadol to plaintiff when plaintiff returned to

22  HDSP on or around November 3, 2008; 4) defendant Medina lied about re-ordering plaintiff's

23  medications and by interfering with prescriptions ordered by Dr. Nepomuceno; and 5) plaintiff's

24  state law claims;

25          2.  Defendants' summary judgment motion (Dkt. No. 71) be granted in all other

26  respects.

30

1          These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

3    one days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6    objections shall be filed and served within fourteen days after service of the objections.  The

7    parties are advised that failure to file objections within the specified time may waive the right to

8    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9    DATED:  March 27, 2012

10

11

12   KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

13   bak2757.sj

14

15

16

17

18

19

20

21

22

23

24

25

26

31