1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                    FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   MICHAEL BAKER,                         No.  2:  09-cv-2757 MCE KJN P

11              Plaintiff,                   ORDER AND

12        v.                                 FINDINGS AND RECOMMENDATIONS

13   PEREZ, et al,

14              Defendants.

15

16   Introduction

17        Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant

18   to 42 U.S.C. § 1983.  This action is proceeding on the amended complaint filed April 5, 2010, as

19   to defendants Miller, Swingle, Medina, St. Laurent and Bowers.  (ECF No. 14.)  Plaintiff alleges

20   that he received inadequate medical care in violation of the Eighth Amendment and state law

21   while housed at High Desert State Prison ("HDSP").

22        On August 10, 2011, defendants filed their first summary judgment motion.  (ECF No.

23   71.)  On March 28, 2012, the undersigned recommended that defendants' motion be granted in

24   part and denied in part.  (ECF No. 102.)  In particular, the undersigned recommended that

25   defendants be granted summary judgment as to all claims against defendants Swingle, St. Laurent

26   and Bowers, and partially as to the claims against defendants Miller and Medina.  (Id.)  The

27   undersigned recommended that defendants' summary judgment be denied as to the state law

28   claims against all defendants and the remaining constitutional claims against defendants Miller

1

1   and Medina.

2        On May 29, 2012, the undersigned denied defendants' request to file a supplemental

3   summary judgment motion.  (ECF No. 109.)

4        On July 20, 2012, the undersigned vacated the March 28, 2012 findings and

5   recommendations and gave plaintiff notice of the requirements for opposing summary judgment

6   motions pursuant to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012).  (ECF No. 113.)  After

7   reviewing plaintiff's supplemental opposition, the undersigned determined that it was in the

8   court's best interest for defendants to file a renewed summary judgment motion.  (ECF No. 118.)

9        Pending before the court is defendants' renewed summary judgment motion.  (ECF No.

10  122).  Defendants argue that they are entitled to qualified immunity.  For the following reasons,

11  the undersigned recommends that defendants' motion be granted in part and denied in part.  In

12  particular, the undersigned recommends that defendants' motion be denied as to plaintiff's claim

13  that defendant Medina violated the Eighth Amendment and state law by failing to prescribe

14  Tramadol upon plaintiff's return to HDSP in November 2008.  The undersigned recommends that

15  defendants' motion be granted in all other respects.

16  Legal Standard for Summary Judgment

17       Summary judgment is appropriate when it is demonstrated that the standard set forth in

18  Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

19  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

20  judgment as a matter of law."  Fed. R. Civ. P. 56(a).

21       Under summary judgment practice, the moving party always bears the initial

22  responsibility of informing the district court of the basis for its motion, and identifying those

23  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

24  together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

25  of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed.

26  R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving

27  party need only prove that there is an absence of evidence to support the non-moving party's

28  case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),

1    627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P.

2    56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not

3    have the trial burden of production may rely on a showing that a party who does have the trial

4    burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary

5    judgment should be entered, after adequate time for discovery and upon motion, against a party

6    who fails to make a showing sufficient to establish the existence of an element essential to that

7    party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477

8    U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving

9    party's case necessarily renders all other facts immaterial."  Id. at 323.

10          Consequently, if the moving party meets its initial responsibility, the burden then shifts to

11   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

12   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

13   establish the existence of such a factual dispute, the opposing party may not rely upon the

14   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

15   form of affidavits, and/or admissible discovery material in support of its contention that such a

16   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

17   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

18   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

19   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

20   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

21   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

22   (9th Cir. 1987).

23          In the endeavor to establish the existence of a factual dispute, the opposing party need not

24   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

25   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

26   trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

27   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

28   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

                                                3

1   amendments).

2          In resolving a summary judgment motion, the court examines the pleadings, depositions,

3   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

4   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

5   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

6   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

7   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

8   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

9   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

10  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

11  some metaphysical doubt as to the material facts. . . .  Where the record taken

12  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13  'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

14  Legal Standards for Qualified Immunity and the Eighth Amendment

15          *Legal Standard for Qualified Immunity*

16          Government officials enjoy qualified immunity from civil damages unless their conduct

17  violates "clearly established statutory or constitutional rights of which a reasonable person would

18  have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In ruling upon the issue of

19  qualified immunity, one inquiry is whether, taken in the light most favorable to the party asserting

20  the injury, the facts alleged show the defendant's conduct violated a constitutional right.  Saucier

21  v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223, 236

22  (2009) ("The judges of the district courts and the courts of appeals should be permitted to

23  exercise their sound discretion in deciding which of the two prongs of the qualified immunity

24  analysis should be addressed first in light of the circumstances in the particular case at hand").

25          The other inquiry is whether the right was clearly established.  Saucier, 533 U.S. at 201.

26  The inquiry "must be undertaken in light of the specific context of the case, not as a broad general

27  proposition...."  Id.  "[T]he right the official is alleged to have violated must have been 'clearly

28  established' in a more particularized, and hence more relevant, sense:  The contours of the right

4

1   must be sufficiently clear that a reasonable official would understand that what he is doing

2   violates that right."  Id. at 202 (citation omitted).  In resolving these issues, the court must view

3   the evidence in the light most favorable to plaintiff and resolve all material factual disputes in

4   favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).  Qualified

5   immunity protects "all but the plainly incompetent or those who knowingly violate the law."

6   Malley v. Briggs, 475 U.S. 335, 341 (1986).

7           *Legal Standard for Eighth Amendment Claim*

8           Generally, deliberate indifference to a serious medical need presents a cognizable claim

9   for a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

10  Estelle v. Gamble, 429 U.S. 97, 104 (1976.)  According to Farmer v. Brennan, 511 U.S. 825, 947

11  (1994), "deliberate indifference" to a serious medical need exists "if [the prison official] knows

12  that [the] inmate [] face[s] a substantial risk of serious harm and disregards that risk by failing to

13  take reasonable measures to abate it."  The deliberate indifference standard "is less stringent in

14  cases involving a prisoner's medical needs than in other cases involving harm to incarcerated

15  individuals because 'the State's responsibility to provide inmates with medical care does not

16  conflict with competing administrative concerns."  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th

17  Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by

18  WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

19          Specifically, a determination of "deliberate indifference" involves two elements:  (1) the

20  seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to

21  those needs.  McGuckin, 974 F.2d at 1059.

22          First, a serious medical need exits if the failure to treat a prisoner's condition could result

23  in further significant injury or the "unnecessary and wanton infliction of pain."  Id. (citing Estelle,

24  429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for medical

25  attention include the existence of an injury that a reasonable doctor or patient would find

26  important and worthy of comment or treatment; the presence of a medical condition that

27  significantly affects an individual's daily activities; or the existence of chronic and substantial

28  pain.  McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41

5

1    (9th Cir. 1990).

2          Second, the nature of a defendant's response must be such that the defendant purposefully

3    ignores or fails to respond to a prisoner's pain or possible medical need in order for "deliberate

4    indifference" to be established. <u>McGuckin</u>, 974 F.2d at 1060.  Deliberate indifference may occur

5    when prison officials deny, delay or intentionally interfere with medical treatment, or may be

6    shown by the way in which prison physicians provide medical care." <u>Hutchinson v. United</u>

7    <u>States</u>, 838 F.2d 390, 392 (9th Cir. 1988).  In order for deliberate indifference to be established,

8    there must first be a purposeful act or failure to act on the part of the defendant and resulting

9    harm.  <u>See</u> <u>McGuckin</u>, 974 F.2d at 1060.  "A defendant must purposefully ignore or fail to

10   respond to a prisoner's pain or possible medical need in order for deliberate indifference to be

11   established." <u>Id.</u>  Second, there must be resulting harm from the defendant's activities.  (<u>Id.</u>)  The

12   needless suffering of pain may be sufficient to demonstrate further harm.  <u>Clement v. Gomez</u>, 298

13   F.3d 898, 904 (9th Cir 2002).

14         Mere differences of opinion concerning the appropriate treatment cannot be the basis of an

15   Eighth Amendment violation.  <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996); <u>Franklin v.</u>

16   <u>Oregon</u>, 662 F.2d 1337, 1344 (9th Cir. 1981).  However, a physician need not fail to treat an

17   inmate altogether in order to violate that inmate's Eighth Amendment rights.  <u>Ortiz v. City of</u>

18   <u>Imperial</u>, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical

19   condition, even if some treatment is prescribed, may constitute deliberate indifference in a

20   particular case.  (<u>Id.</u>)

21         In order to defeat defendant's summary judgment motion, plaintiff must "produce at least

22   some significant probative evidence tending to [show]," <u>T.W. Elec. Serv.</u>, 809 F.2d at 630, that

23   defendant's actions, or failure to act, were "in conscious disregard of an excessive risk to

24   plaintiff's health." <u>Jackson v. McIntosh</u>, 90 F.3d at 332 (citing <u>Farmer</u>, 511 U.S. at 837).

25   <u>Plaintiff's Claims</u>

26         Plaintiff alleges that he did not receive his medications while housed in the Z Unit at

27   HDSP because defendant Miller, a Supervising Nurse, failed to adequately train the nurses she

28   supervised regarding medication distribution policies and procedures.  Plaintiff also alleges that

1  defendant Miller failed to implement and enforce adequate medication distribution policies.

2  Plaintiff also alleges that he did not receive his medication because defendant Miller did not

3  adequately staff the nurses on duty.

4         Plaintiff alleges that defendant Medina, a HDSP Physician's Assistant, wrongly

5  discontinued his Tramadol prescription on November 10, 2008.  Plaintiff also alleges that the

6  dose of Tramadol defendant Medina prescribed when he reinstated the Tramadol was inadequate.

7  Plaintiff also alleges that defendant Medina lied about re-ordering plaintiff's medications and by

8  interfering with prescriptions ordered by Dr. Nepomuceno.

9         Plaintiff alleges that he did not receive his medications while housed in the Z unit because

10  defendant Swingle, the HDSP Chief Medical Officer ("CMO"), failed to adequately train and

11  supervise the nursing staff.  Plaintiff also alleges that defendant Swingle failed to implement and

12  enforce adequate medication distribution policies.  Plaintiff also alleges that defendant Swingle

13  caused him to suffer withdrawal symptoms from Tramadol.

14         Plaintiff alleges that defendants St. Laurent and Bowers, Psychiatric Technicians ("psych

15  techs"), failed to treat his stomach pain.

16  Undisputed Facts

17         Plaintiff was housed in the Z-Unit at HDSP from May 15, 2007 to July 10, 2008, and from

18  November 12, 2008, to February 26, 2009.  (ECF No. 14 at 10.)

19         *Defendant Miller*

20         On or around June 2007, plaintiff had an intervertebral disk replacement.  (ECF No. 128-9

21  at 6, 8.)  Following this surgery, plaintiff was prescribed Gabapentin for pain.  (Id. at 8.)

22         Defendant Miller worked as a Supervising Nurse on the Z Unit from late 2007 through

23  May 2009, with the exception of August 2008 when she took a leave of absence until October

24  2008.  (ECF No. 122-7 at 2.)

25         On January 6, 2008, plaintiff filed a grievance stating that "numerous times" he had not

26  received his Gabapentin in the mornings, usually on weekends.  (ECF No. 14 at 42.)  Plaintiff

27  wrote that since keeping track of dates, he did not receive his Gabapentin on January 1, 2008, and

28  January 6, 2008.  (Id.)  January 1, 2008, was a Tuesday.  January 6, 2008, was a Sunday.

On January 10, 2008, Nurse Clark responded that he had no control over what happens when he is not there.  (Id.)  He stated that he would speak to his immediate supervisor, i.e., defendant Miller, regarding the matter.  (Id.)

On February 1, 2008, plaintiff did not receive his night Gabapentin.  (ECF No. 14 at 14.)  On February 2, 2008, plaintiff did not receive his morning or night Gabapentin.  (Id.)  On February 3, 2008, plaintiff did not receive his morning Gabapentin.  (Id.)    February 1, 2 and 3 were a Friday, Saturday and Sunday.

On February 3, 2008, plaintiff submitted a Health Care Request form stating that his Gabapentin had not been delivered since the morning of February 1, 2008.  (ECF No. 128-9 at 17.)  In response, a prison official (who plaintiff claims is Nurse Clark) responded that the "Supervisor was aware of the situation over the past few weekends…[you] have been receiving medication since Tuesday February 5, 2008.  Was seen on the M.D. line 2/5/08."  (Id.)

Defendant Miller interviewed plaintiff on February 26, 2008, regarding his grievance concerning medication distribution.  (ECF. No. 122-7 at 3.)

Plaintiff did not receive his medications on April 26, 2008, May 18, 2008, and on two occasions in June 2009.  (ECF No. 14 at 16-17.)  April 26, 2008, was a Saturday.  May 18, 2008, was a Sunday.

Defendant Miller's duties included supervising Nurse Clark, as well as providing nursing service for telemedicine, the inside and outside specialty clinic, receiving and release department, as well as other responsibilities. (ECF No. 122-7 at 3.)  Defendant Miller supervised Nurse Clark from late 2007 through May 2009 with the exception of when Miller was on leave from August-October 2008.  (Id.)  Nurse Clark was the only nurse in Z-unit under defendant Miller's direct supervision.  (Id.)

Nurses at HDSP receive an orientation program upon their arrival at HDSP that can last several weeks.  (Id.)  This orientation includes instruction from the Nurse Instructor, as well as shadowing nurses in various parts of the institution.  (Id.)   This orientation is directed by the Nurse Instructor, not defendant Miller.  (Id.)   Regular nurse training is conducted by the Nurse Instructor.  (Id.)

8

In 2008, up until her leave of absence in August, defendant Miller was in charge of scheduling nurses on weekdays and weekends.  (Id.)  Defendant Miller was not responsible for rearranging the weekend schedule when there were call offs or other required diversions of nursing staff based on institutional needs.  (Id.)  When defendant Miller returned to work in October 2008 after her leave of absence, she was no longer in charge of scheduling nurses.  (Id.)

In his opposition, plaintiff claims that defendant Miller was responsible for training nurses and assessing training needs.  (ECF No. 128-4 at 15.)  The undersigned addresses this claim herein.

In support of this claim, plaintiff refers to three exhibits, which he identifies as "IMSPP." (Id.)  The first exhibit, identified as plaintiff's C-37, is titled "Overview of Health Care Services." (ECF No. 128-7 at 16.)  Plaintiff refers to the section titled "Staff Responsibility," which states that all licensed staff shall perform duties consistent with the applicable licensing requirements of their specific discipline.  (Id.)  This exhibit is not evidence that defendant Miller trained nurses.

Plaintiff next refers to his exhibit C-45 which is a document titled "Introduction to Nursing Protocols."  (ECF No. 128-7 at 26.)  Plaintiff refers to the section titled "Training."  This section states that "Periodic inservices, skill checks, and reviews shall be conducted by a Supervising Registered Nurse, or designee, so that nurses maintain baseline competencies with regard to physical assessment and use of nursing protocols."  (Id.)  While defendant Miller does not address in her declaration whether she conducted inservice reviews regarding medication distribution, this exhibit does not demonstrate that defendant Miller was responsible for providing the initial training regarding medication distribution.  This document is also not evidence that defendant Miller provided inservice training regarding medication distribution to any of the nurses who allegedly did not distribute plaintiff's medication.

Finally, plaintiff refers to his exhibit C-60.  (Id. at 43.)  Plaintiff's exhibit C-60 is a document titled "Implementation and Review of Health Care Policies and Procedures."  (Id.) Plaintiff refers to the section titled "Training Responsibility," which states that Health Care supervisors are responsible for being knowledgeable of the policies and procedures relevant to their portions of the health care system, and they shall discuss the contents of the new and revised

1  policies, and conduct training on them with their staff.  (Id.)  This exhibit is not evidence that

2  defendant Miller was responsible for providing training regarding medication distribution to the

3  staff who allegedly failed to provide plaintiff with medication.

4      Plaintiff also refers to his amended complaint at page 10 where he alleges that defendant

5  Miller did not properly train nurses.  (ECF No. 14 at 10.)  This statement in plaintiff's amended

6  complaint is not evidence regarding defendant Miller's training responsibilities.

7      In his opposition, plaintiff claims that defendant Miller was responsible for scheduling

8  nurses in the Z Unit after she returned to work after her leave of absence.  (ECF No. 128-4 at 15.)

9  In support of this claim, plaintiff refers to defendant Miler's responses to several requests for

10  admissions.  (ECF No. 128-10 at 28-29, 38-39.)  The requests for admissions referred to by

11  plaintiff do not indicate that defendant Miller scheduled nurses after her return to the Z Unit after

12  her leave of absence.

13      *Defendant Medina*

14      At all relevant times, defendant Medina worked as a physician's assistant at HDSP.  (ECF

15  No. 122-9 at 2.)

16      In July 2008, plaintiff was transferred from HDSP to California State Prison-Corcoran

17  ("Corcoran").  (ECF No. 14 at 17.)  On November 3, 2008, plaintiff transferred back to HDSP

18  from Corcoran.  (Id.)

19      At some time prior to plaintiff's transfer back to HDSP in November 2008, plaintiff was

20  prescribed Tramadol for gastro-intestinal pain by doctors at HDSP and Corcoran.  (ECF No. 98-3

21  at 14 (June 10, 2008 Progress Note from HDSP indicating plaintiff prescribed Tramadol)); (Id. at

22  15 (July 30, 2008 entry in plaintiff's medical records from Corcoran indicating plaintiff was

23  prescribed Tramadol)).[1]  The undersigned cannot determine the dose of Tramadol prescribed from

24

_____

25  [1]   These records indicating plaintiff's previous prescriptions for Tramadol are attached as
   exhibits to plaintiff's opposition to defendants' original summary judgment motion.  The

26  undersigned has looked through the voluminous records and exhibits attached to plaintiff's
   opposition attached to the pending summary judgment motion and cannot locate these records.

27  Because defendants do not seriously dispute plaintiff's previous prescription for Tramadol for
   gastro-intestinal pain, the undersigned references these records in the instant findings and

28  recommendations.

1    the July 30, 2008 medical records.  Plaintiff claims that it was 50 mg. Tramadol, four times per

2    day.

3          On November 10, 2008, defendant Medina discontinued plaintiff's Tramadol prescription.

4    (ECF No. 122-9 at 2.)

5          The undersigned notes that plaintiff alleges he arrived at HDSP from Corcoran with a

6    prescription for Tramadol, but he did not receive Tramadol from November 3, 2008, to November

7    10, 2008.  (ECF No. 128-1 at 1.)

8          On November 14, 2008, defendant Medina reinstated plaintiff's Tramadol prescription at

9    a dose of 50 mg. twice a day.  (ECF No. 122-9 at 2.)  On December 3, 2008, defendant Medina

10   increased plaintiff's Tramadol dosage to three times a day, based on a recommendation by Dr.

11   Harrison, a gastrointestinal specialist.  (Id.)

12         On December 17, 2008, defendant Medina ordered a heptatobiliary iminodiacetic acid

13   ("HIDA") scan for plaintiff to evaluate plaintiff's gastrointestinal symptoms.  (ECF No. 122-9 at

14   3.)  On January 28, 2009, defendant ordered refills of several prescriptions for plaintiff, including

15   Tramadol.  (Id.)  On February 11, 2009, defendant Medina reordered plaintiff's Tramadol

16   prescription.  (Id.)

17       *Defendant Swingle*

18         At all relevant times, defendant Swingle worked as the CMO at HDSP.  (ECF No. 122-6

19   at 2.)  As the CMO, defendant Swingle was not responsible for supervising nurses or medication

20   delivery.  (Id.)  As the CMO, defendant Swingle was responsible for medical delivery at HDSP.

21   (Id.)  Medical delivery consists of overseeing medical providers and helping to shape medical

22   policies to ensure that the best medical care is delivered to the patients.  (Id.)  Medical providers

23   are licensed doctors, physicians assistants and nurse practitioners.  (Id.)

24         As the CMO, one of defendant Swingle's responsibilities was responding to

25   administrative appeals.  (Id.)  Defendant Swingle responded to a second level appeal from

26   plaintiff on April 30, 2008.  (Id. at 3.)  This grievance concerned plaintiff's complaints that he had

27   not received his pain medications, especially in the mornings.  (ECF No. 14 at 48.)  In response,

28   defendant Swingle stated that at the first level interview, plaintiff told defendant Miller that he

1   had been receiving his mediation since filing the appeal.  (Id.)  Defendant Swingle denied

2   plaintiff's request to counsel and reprimand nursing staff.  (Id.at 49.)  Defendant Swingle also

3   denied plaintiff's request for the names of individuals for future appeals.  (Id.)  Because defendant

4   Swingle denied the requests regarding reprimanding staff and because plaintiff was receiving his

5   medication, this appeal was partially granted.  (Id. at 48.)

6        Defendant Swingle also reviewed a second level appeal from plaintiff in January 2009.

7   (ECF No. 122-6 at 2.)  In this appeal, in relevant part, plaintiff complained that he was not

8   receiving his prescribed medications and his Ensure.  (ECF No. 14 at 70.)  Plaintiff also requested

9   a pillow.  (Id.)  In response, defendant Swingle stated that she concurred with plaintiff's current

10  does of Tramadol and the dose would not be increased.  (Id. at 71.)  Defendant Swingle stated that

11  medical staff at Z Unit were contacted to make sure that plaintiff received his nutritional

12  supplement twice a day.  (Id.)

13       In his opposition, plaintiff claims that defendant Swingle was responsible for supervising

14  nurses and medication delivery.  (ECF No. 128-4 at 16.)  The undersigned addresses this

15  argument herein.

16       In support of his argument that defendant Swingle was responsible for supervising nurses

17  and medication delivery, plaintiff refers to several exhibits attached to his opposition.  Plaintiff

18  refers to HDSP Operational Procedure # 46, section IV, which states that the CMO has overall

19  responsibility for the Health Care Transfer Processes.  (ECF No. 128-5 at 10.)  This document

20  goes on to state that the Director of Nursing is responsible to ensure compliance by all nursing

21  staff.  (Id.)  This document does not state that the CMO is responsible for supervising nurses and

22  medication delivery.

23       Plaintiff next refers to HDSP Operational Procedure # 711, Medication Management,

24  section IV, which states that the CMO has total responsibility for the Medication Management to

25  the inmate population at HDSP.  (Id. at 29.)  This document goes on to state that the Supervising

26  Registered Nurse and other nursing staff are responsible to oversee all medication management

27  distribution.  (Id.)  This document does not state that the CMO was responsible for supervising

28  the nursing staff who delivered medication.

1    Plaintiff next refers to HDSP Operational Procedure # 14, section IV.  (ECF No. 128-6 at

2    3.)  This document states that the CMO has overall responsibility for the procedures regarding

3    nursing protocols.  (Id.)  This section goes on to state that the Director of Nurses and Supervising

4    Nurses are responsible to oversee the implementation of the nursing protocols.  (Id.)  This

5    document does not state that the CMO was responsible for supervising the nursing staff who

6    delivered medication.

7    Plaintiff cites the California Department of Corrections and Rehabilitation ("CDCR")

8    Department Operations Manual ("DOM"), section 91040.3 which states that the CMO is

9    responsible for all health care services at a facility.  (Id. at 27.)  This document does not state that

10   the CMO is responsible for supervising the nursing staff who deliver medication.

11   Finally, plaintiff cites the Duty Statement for the HDSP CMO.  (Id. at 30-31.)  This

12   document does not state that the CMO is responsible for supervising the nursing staff who deliver

13   medication.

14   While defendant Swingle may have overall responsibility for medical care at HDSP,

15   including creating medical policies, plaintiff cites no specific policy that led to his alleged failure

16   to receive medication.  Instead, plaintiff alleges that nursing staff were inadequately trained

17   regarding the policies or were understaffed.  It is clear that defendant Swingle was not responsible

18   for these matters.  Moreover, by citing documents that state that defendant Swingle was

19   responsible for overall health care at HDSP, plaintiff is attempting to base defendant Swingle's

20   liability on the improper theory of respondeat superior.

21   The Civil Rights Act under which this action was filed provides as follows:

22       Every person who, under color of [state law] . . . subjects, or causes
         to be subjected, any citizen of the United States . . . to the
23       deprivation of any rights, privileges, or immunities secured by the
         Constitution . . . shall be liable to the party injured in an action at
24       law, suit in equity, or other proper proceeding for redress.

25   42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

26   actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

27   Monell v. Department of Social Servs., 436 U.S. 658 (1978) ("Congress did not intend § 1983

28   liability to attach where . . . causation [is] absent."); Rizzo v. Goode, 423 U.S. 362 (1976) (no

13

1   affirmative link between the incidents of police misconduct and the adoption of any plan or policy

2   demonstrating their authorization or approval of such misconduct).  "A person 'subjects' another

3   to the deprivation of a constitutional right, within the meaning of § 1983, if he does an

4   affirmative act, participates in another's affirmative acts or omits to perform an act which he is

5   legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy,

6   588 F.2d 740, 743 (9th Cir. 1978).

7         Moreover, supervisory personnel are generally not liable under § 1983 for the actions of

8   their employees under a theory of respondeat superior and, therefore, when a named defendant

9   holds a supervisorial position, the causal link between him and the claimed constitutional

10   violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979)

11   (no liability where there is no allegation of personal participation); Mosher v. Saalfeld, 589 F.2d

12   438, 441 (9th Cir. 1978) (no liability where there is no evidence of personal participation), cert.

13   denied, 442 U.S. 941 (1979).  Vague and conclusory allegations concerning the involvement of

14   official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673

15   F.2d 266, 268 (9th Cir. 1982) (complaint devoid of specific factual allegations of personal

16   participation is insufficient).

17         For these reasons, plaintiff cannot base defendant Swingle's liability on regulations stating

18   that the CMO is ultimately responsible for medical care at HDSP.

19         *Defendants Bowers and St. Laurent*

20         At all relevant times, defendants St. Laurent and Bowers worked as psych techs at HDSP.

21   (ECF No. 122-8 at 1; ECF No. 122-5 at 1.)

22         Defendant St. Laurent was a senior psych tech who supervised a team of psych techs.

23   (ECF No. 122-8 at 1.)

24         On the morning of November 6, 2008, plaintiff called out "man down" and asked

25   defendant Bowers for help.  (ECF No. 14 at 18.)  As a psych tech, defendant Bowers is not

26   trained as a first responder.  (ECF No. 122-5 at 2.)  When an inmate reports that he is "man

27   down," custody staff is alerted and the clinic RN/LVN rover, who is a first responder, brings a

28   bag of emergency supplies, and responds.  (Id.)

14

1    Psych techs cannot provide prescribe medications and can only distribute medications in

2    the manner prescribed by a licensed medical provider.  (ECF No. 122-2 at 2.)

3    In his opposition, plaintiff claims that psych techs are trained as first responders.  Plaintiff

4    cites a document from the Division of Correctional Health Care Services which defines a "First

5    Responder" as the first staff member, certified in Basic Life Support on the scene of a medical

6    emergency.  (ECF No. 128-6 at 51.)  This document also includes psych techs as part of the

7    health care staff who *may* be trained as first responders.  (Id. emphasis added.)

8    The document cited above does not state that the HDSP Emergency Medical response

9    team includes psych techs.  For this reason, the undersigned does not find that plaintiff has

10    demonstrated that either defendant St. Laurent or Bowers were able to respond to his "man down"

11    call as first responders.

12    Discussion

13    *Defendant Miller*

14    As discussed above, plaintiff alleges that he did not receive his pain medication while

15    housed in the Z Unit at HDSP because defendant Miller failed to adequately train the nurses she

16    supervised regarding medication distribution policies and procedures.  Plaintiff also alleges that

17    defendant Miller failed to implement and enforce adequate medication distribution policies.

18    Finally, plaintiff alleges that he did not receive his medication because defendant Miller did not

19    adequately staff the nurses on duty.

20    Regarding plaintiff's claim that defendant Miller failed to adequately train the nurses she

21    supervised, it is undisputed that defendant Miller was not responsible for training nurses.

22    Accordingly, defendant Miller should be granted summary judgment as to this claim.

23    Regarding plaintiff's claim that defendant Miller failed to adequately implement and

24    enforce adequate medication distribution policies, it is undisputed that defendant Miller

25    supervised only one nurse, i.e., Nurse Clark, during both times plaintiff was housed in the Z Unit.

26    Therefore, defendant Miller's only involvement with the enforcement and implementation of

27    medication distribution policies was by way of Nurse Clark.  Plaintiff does not allege that Nurse

28    Clark, who is not named as a defendant, was a specific problem while he was housed in the Z

15

1  Unit.  For these reasons, the undersigned finds that defendant Miller should be granted summary

2  judgment as to plaintiff's claim that she did not enforce and implement adequate medication

3  distribution policies when plaintiff was housed in the Z Unit.

4         Plaintiff has presented no evidence that understaffing by defendant Miller actually caused

5  him to not receive his medication.  During plaintiff's first time in the Z Unit, defendant Miller

6  was responsible for scheduling nurses on weekends, when plaintiff seemed to have the most

7  trouble getting his medication, and weekdays.  Defendant Miller was not responsible for

8  rearranging the weekend schedule when there were call offs or other required diversions of

9  nursing staff based on institutional needs.  Plaintiff has presented no evidence that the weekend

10 staff failed to deliver his medication because defendant Miller did not schedule adequate staff

11 versus there was not adequate staff due to call offs or other required diversions of staff.

12        It is also undisputed that defendant Miller was not responsible for scheduling nurses when

13 she returned to HDSP in October 2008 after her leave of absence.

14        For the reasons discussed above, defendant Miller should be granted summary judgment

15 as to plaintiff's claim that he did not receive his medication because she understaffed the nurses

16 who distributed medication.

17        Because the undersigned finds that defendant Miller did not violate plaintiff's Eighth

18 Amendment rights, there is no need to address the second prong of the qualified immunity

19 analysis, i.e., whether plaintiff's rights were clearly established.

20        *Defendant Medina*

21        As discussed above, plaintiff alleges that defendant Medina wrongly discontinued

22 plaintiff's Tramadol prescription on November 10, 2008.  Plaintiff also alleges that the dose

23 prescribed by defendant Medina when he reinstated the Tramadol was inadequate.  Plaintiff also

24 alleges that defendant Medina lied about re-ordering plaintiff's medications and by interfering

25 with prescriptions ordered by Dr. Nepomuceno.

26        Defendants argue that defendant Medina did not act with deliberate indifference when he

27 discontinued plaintiff's Tramadol on November 10, 2008.  Defendants argue that defendant

28 Medina discontinued the Tramadol based on his own medical judgment that plaintiff did not need

16

the Tramadol.  In support of this claim, defendants refer to defendant Medina's declaration

submitted in support of the summary judgment motion:

> 8. When I reviewed Baker's file on November 10, 2008, I saw that
> he had been prescribed Tramadol, but in my medical judgment, I
> did not believe he needed Tramadol and Gabapentin, since both are
> pain medications, and I had concerns regarding addiction and
> potential side-effects.
>
> 9.  Tramadol is a non-opiate medication that can be habit-forming.
>
> 10.  Inmates often seek Tramadol prescriptions for secondary gain.
>
> 11.  Also, Tramadol is a non-formulary medication at HDSP.
>
> 12.  Both Tramadol and Gabapentin have to be processed through
> the liver, and I was concerned that Tramadol in this situation, which
> was technically an off-label usage, could obscure other gastro-
> intestinal symptoms.
>
> 13.   For these reasons, I am reluctant to prescribe Tramadol,
> especially when other pain medication has proven to be effective.
>
> 14.  Based on all of these reasons, and in my medical judgment, I
> discontinued Baker's Tramadol prescription on November 10,
> 2008.

(ECF No. 122-9 at 2.)

At the outset, the undersigned finds that it is clear from the record that plaintiff's gastro-

intestinal problems, later diagnosed as Irritable Bowel Syndrome, constituted a serious medical

need.  The record demonstrates that this condition caused plaintiff to suffer pain for which he was

prescribed pain medication, i.e., Tramadol.

The undersigned next turns to the issue of whether defendant Medina acted with deliberate

indifference when he discontinued plaintiff's Tramadol.

It is undisputed that plaintiff returned to HDSP with a prescription for Tramadol that he

had received from medical doctors at Corcoran and HDSP.  Plaintiff alleges that he did not

receive the Tramadol upon his return from November 3, 2008, to November 10, 2008.  (ECF No.

128-1 at 30.)  It is undisputed that on November 10, 2008, defendant Medina discontinued the

Tramadol prescription, which he reinstated four days later on November 14, 2008.  Therefore,

when defendant Medina discontinued plaintiff's Tramadol prescription, plaintiff had not been

1   receiving Tramadol for seven days.

2          Plaintiff alleges that he went "man down" on November 6, 2008, due to stomach pain.

3   (ECF No. 128-3 at 30.)  Prior to seeing defendant Medina on November 10, 2008, plaintiff went

4   "man down" again, due to stomach pain.  (Id.)

5          In his opposition, plaintiff alleges that defendant Medina was aware of the pain he

6   suffered from November 3, 2008, to November 10, 2008.  Plaintiff refers to a Health Care

7   Services Request Form he completed on November 6, 2008, in which he stated that he was not

8   receiving his Tramadol as ordered by Dr. Clark.  (ECF No. 128-8 at 34.)  Plaintiff stated that with

9   regard to his failure to receive his pain mediation, he lay in bed all day without it.  (Id.)  Plaintiff

10  stated that his pain level was at an 8 on a scale of 1-10.  (Id.)  The form states that it was received

11  by defendant St. Laurent on November 7, 2008, and seen by plaintiff's primary care provider.

12  (Id.)  According to plaintiff, defendant Medina was his primary care provider.  (ECF No. 128-1 at

13  1.)

14         Taking the facts in the light most favorable to plaintiff, the undersigned cannot find that,

15  as a matter of law, defendant Medina did not act with deliberate indifference when he

16  discontinued plaintiff's Tramadol prescription.  The record does not explain why defendant

17  Medina, a physician's assistant, substituted his own judgment regarding plaintiff's need for

18  Tramadol over that of medical doctors.  While defendant Medina suggests in his declaration that

19  he was reluctant to prescribe Tramadol because the Gabapentin plaintiff was receiving was

20  effective in treating plaintiff's pain, the Gabapentin had been prescribed to treat plaintiff's back

21  pain and not his stomach pain.  Defendant Medina does not address why he believed the

22  Gabapentin was sufficient to treat plaintiff's stomach pain.  The record also indicates that on

23  November 10, 2008, defendant Medina had knowledge that plaintiff had not been receiving his

24  Tramadol for several days and was in great pain.  For these reasons, defendant Medina's

25  summary judgment motion as to this claim should be denied.

26         Turning to the second element of the qualified immunity analysis, the undersigned

27  considers whether plaintiff's rights were clearly established, i.e., would a reasonable physician's

28  assistant have known that discontinuing plaintiff's Tramadol prescription violated the Eighth

18

1    Amendment.

2          Plaintiff's Eighth Amendment right to adequate medical care clearly included the right to

3    adequate pain medication.  Based on the record, the undersigned finds that a reasonable

4    physician's assistant would have known that discontinuing plaintiff's Tramadol prescription

5    violated the Eighth Amendment.  As discussed above, plaintiff arrived at HDSP with a

6    prescription for Tramadol from a medical doctor.  After the Tramadol was discontinued upon his

7    return to HDSP, plaintiff complained of significant pain.  Arguably, a reasonable physician's

8    assistant would not have substituted his own judgment for that of a medical doctor regarding

9    plaintiff's need for pain medication.  Accordingly, defendant Medina is not entitled to qualified

10   immunity as to this claim.

11         Plaintiff next argues that defendant Medina acted with deliberate indifference when he

12   reinstated plaintiff's Tramadol prescription at a dose of 50 mg., twice per day, rather than four

13   times per days, as allegedly had been previously ordered by doctors at Corcoran.

14         It is undisputed that on November 14, 2008, defendant Medina prescribed Tramadol 50

15   mg. twice a day.  On December 3, 2008, defendant Medina increased this dose to Tramadol 50

16   mg. three times per day based on a recommendation by Dr. Harrison, a gastrointestinal specialist.

17   The report by Dr. Harrison is attached as an exhibit to plaintiff's opposition to defendants'

18   original summary judgment motion.  In this report dated May 2, 2008, Dr. Harrison

19   recommended increasing plaintiff's Tramadol dose from 50 mg. twice a day to 50 mg. three to

20   four times per day.  (ECF No. 98-3 at 28-29.)

21         Defendant Medina did not act with deliberate indifference when he prescribed Tramadol

22   50 mg. twice per day.  This dose was not significantly different from the dose recommended by

23   Dr. Harrison.  Moreover, defendant Medina increased plaintiff's dose of Tramadol to that

24   recommended by the gastrointestinal specialist Dr. Harrison, i.e., Tramadol 50 mg. three times

25   per day, a short time later.  This brief denial of Tramadol at the dose recommended by Dr.

26   Harrison did not violate the Eighth Amendment.  Accordingly, defendant Medina should be

27   granted summary judgment as to this claim.  Because defendant Medina is entitled to summary

28   judgment as to the merits of this claim, the undersigned need not address the second prong of the

1    qualified immunity analysis.

2        Plaintiff also alleges that defendant Medina lied about re-ordering his medications and

3    interfered with prescriptions by Dr. Nepomuceno.  Plaintiff's amended complaint includes 6

4    pages of allegations regarding his failure to receive medication and Ensure beginning in

5    December 2008 through February 2009.  (ECF No. 14 at 22-28).  Plaintiff alleges that defendant

6    Medina was responsible for plaintiff's failure to receive his medication and Ensure.

7        In the summary judgment motion, defendants argue that plaintiff's claims that defendant

8    Medina lied about reordering his medication and interfered with prescriptions are vague and

9    conclusory.  Defendants argue that there is no evidence besides plaintiff's bare assertion that

10   defendant Medina ever interfered with plaintiff's prescriptions.  In his declaration submitted in

11   support of the pending motion, defendant Medina states, in relevant part,

12
13          19.  I did not see Baker again until December 17, 2008, when I ordered a hepatobiliary iminodiacetic acid (HIDA) scan for him to evaluate his gastrointestinal symptoms.

14
15          20.   On January 21, 2009, I saw Baker again and ordered a gastrointestinal specialist (GI) consult for him.

16
17          21.  On January 28, 2009, I ordered refills of several prescriptions for Baker, not including Tramadol, because his prescription for Tramadol was still current at that time.

18
19          22.   On February 11, 2009, I reordered Baker's Tramadol. However, the prescription had to be approved for non-formulary use by the pharmacy committee.

20
21          23.  I have never interfered with the prescription written by another doctor or P.A,. and I did not interfere with any prescription that Dr. Nepomuceno may have written for Baker.

22          24.  I did not allow Baker's Tramadol prescription to expire in February 2009.

23
24          25.   When I refilled his prescriptions on January 28, 2009, the Tramadol prescription was still current until February 5, 2009.

25   (ECF No. 122-9 at 3.)

26        In his opposition, plaintiff alleges that on January 21, 2009, he saw defendant Medina for

27   renewal of his medication.  (ECF No. 128-3 at 16.)  Plaintiff alleges that defendant allowed his

28   prescription for Ensure to expire on January 29, 2009, and the Tramadol prescription to expire on

1    February 5, 2009.  (<u>Id.</u>)  Plaintiff alleges that he suffered from pain from February 6, 2009, to

2    February 20, 2009.  (<u>Id.</u>)  The allegations in the amended complaint are consistent with these

3    claims.  (ECF No. 14 at 26-28.)

4         According to defendant Medina, he did not re-order plaintiff's Tramadol prescription on

5    January 28, 2009, because it was still current.[2]  According to plaintiff, his Tramadol prescription

6    expired on February 5, 2009.  In his declaration, defendant Medina states that he reordered

7    plaintiff's Tramadol prescription on February 11, 2009, but it had to be approved for non-

8    formulary by the pharmacy committee.

9         The facts described above do not demonstrate that defendant Medina intentionally allowed

10   plaintiff's Tramadol prescription to expire.  There is no evidence that defendant Medina refused

11   to re-order the Tramadol between February 5, 2009, and February 11, 2009.  While plaintiff

12   claims that requests for non-formulary medication take no more than 48 hours to process (ECF

13   No. 128-3 at 17), plaintiff has provided no evidence regarding when defendant Medina's

14   February 11, 2009 request for plaintiff's non-formulary Tramadol was actually approved.

15   Plaintiff's claim that defendant Medina interfered with his Tramadol prescription until it was

16   finally received on February 20, 2009, is unsupported.

17        Plaintiff's claim regarding the alleged discontinuation of his Ensure prescription is vague

18   and conclusory.  While plaintiff alleges that defendant Medina allowed his prescription for

19   Ensure to expire on January 29, 2009, he does not allege when it was reinstated.  Plaintiff offers

20   no evidence demonstrating that defendant Medina intentionally allowed the prescription to expire.

21        Accordingly, for the reasons discussed above, defendant Medina should be granted

22   summary judgment as to plaintiff's claims that he interfered with his prescriptions and lied about

23   reordering his medication.  Because defendant Medina is entitled to summary judgment as to the

24   merits of this claim, the undersigned need not address the second prong of the qualified immunity

25   analysis.

26   _____

27   [2] While it may have been a questionable practice for defendant Medina to wait until plaintiff's
     prescription expired, thereby almost assuredly resulting in a delay in the prescription being
28   refilled, it cannot be said that such alleged action constituted deliberate indifference.

1          *Defendant Swingle*

2                  As discussed above, plaintiff alleges that he did not receive his medications while housed

3     in the Z unit because defendant Swingle, the HDSP CMO, failed to adequately train and supervise

4     the nursing staff.  Plaintiff also alleges that defendant Swingle failed to implement and enforce

5     adequate medication distribution policies.  Plaintiff also alleges that defendant Swingle caused

6     him to suffer withdrawal symptoms from Tramadol.

7                  As discussed above, it is undisputed that defendant Swingle did not supervise medication

8     delivery and was not in charge of nurses.  For this reason, defendant Swingle should be granted

9     summary judgment as to plaintiff's claim that he did not receive his medication because

10    defendant Swingle failed to adequately train and supervise the nursing staff.

11                 Plaintiff also alleges that defendant Swingle failed to implement and enforce adequate

12    medication distribution policies.  Plaintiff does not identify any particular policy enacted by

13    defendant Swingle that led to plaintiff's failure to receive medication.  For this reason, and

14    because defendant Swingle does not supervise or train the nursing staff who distribute

15    medication, defendant Swingle should be granted summary judgment as to this claim.

16                 Plaintiff alleges that defendant Swingle was responsible for plaintiff's failure to receive

17    Tramadol upon his return to HDSP, causing him to suffer withdrawal.  Plaintiff may also be

18    claiming that defendant Swingle was responsible for his failure to obtain a prescription for

19    Tramadol, 50 mg., four times per day, rather than two times per day, as prescribed by defendant

20    Medina on November 14, 2008.

21                 The record indicates that defendant Swingle's only involvement with plaintiff regarding

22    the Tramadol prescription following plaintiff's return to HDSP in November 2008 was

23    defendant's response to plaintiff's inmate grievance.  As indicated above in the statement of

24    undisputed facts, by the time defendant Swingle reviewed this grievance in January 2009,

25    plaintiff had been prescribed Tramadol at a dose of 50 mg., three times per day.  This is the dose

26    recommended by Dr. Harris, the gastrointestinal specialist.  Accordingly, defendant Swingle is

27    entitled to summary judgment as to plaintiff's claim that he did not receive Tramadol, 50 mg. four

28    times per day.

1    There is no evidence in the record linking defendant Swingle to plaintiff's failure to obtain

2    Tramadol upon his arrival at HDSP until November 14, 2008.  Moreover, there is no evidence

3    linking defendant Swingle to plaintiff's claim challenging defendant Medina's decision to

4    reinstate the Tramadol prescription at 50 mg., twice per day.  For these reasons, defendant

5    Swingle should be granted summary judgment as to this claim.

6    For the reasons discussed above, defendant Swingle should be granted summary judgment

7    as to all of plaintiff's claims.  Because defendant Swingle is entitled to summary judgment as to

8    the merits of this claim, the undersigned need not address the second prong of the qualified

9    immunity analysis.

10   *Defendants Bowers and St. Laurent*

11   In order to put defendant's summary judgment motion in context, the undersigned will

12   summarize plaintiff's allegations against defendants Bowers and St. Laurent as set forth in the

13   amended complaint.

14   Plaintiff alleges that on November 4, 2008, he told defendant Bowers that he had not

15   received his Tramadol.  (ECF No. 14 at 17.)  On the morning of November 5, 2008, defendant

16   Bowers brought plaintiff Gabapentin but not Tramadol.  (Id. at 18.)

17   On the morning of November 6, 2008, plaintiff told defendant Bowers that he was "man

18   down."  (Id.)  Plaintiff told defendant Bowers that he could not eat or sleep, his gut was killing

19   him, and that it hurt badly.  (Id.)  An Officer Brown said he would call someone.  (Id.)  Three

20   hours later, plaintiff asked Officer Brown, "what's up, I need a doctor."  (Id.)  Officer Brown

21   replied, "He didn't come talk to you?"  (Id.)

22   On November 10, 2008, plaintiff went "man down."  (Id. at 19.)  Plaintiff was taken to a

23   holding cage to wait for treatment.  (Id.)  While plaintiff waited, defendant Bowers told plaintiff,

24   "They found your order for Tramadol and it will start tomorrow."  (Id.)  Later, Officer Boutler or

25   Haas told plaintiff that defendant St. Laurent refused to see him because "she had real patients to

26   treat."  (Id.)  As Officers Boutler and Haas helped plaintiff back to his cell, Officer Boutler stated,

27   "St. Laurent informed that Baker will get his stomach pills tomorrow."  (Id.)

28   ////

1    Defendants move for summary judgment as to plaintiff's claims against defendant St.

2    Laurent on grounds that they are based on hearsay, i.e., that someone told him that she refused to

3    treat him.  Defendants move for summary judgment as to the claims against defendant Bowers on

4    grounds that defendant Bowers was not a first responder, nor was he trained as one.

5    As discussed above, it is undisputed that neither defendant Bowers nor St. Laurent were

6    trained as a first responder.  Because they was not trained as a first responder, defendants Bowers

7    and St. Laurent did not act with deliberate indifference when they allegedly failed to respond

8    when plaintiff went "man down."  It is also undisputed that psych techs cannot prescribe

9    medication and can only distribute medications in the manner prescribed by a licensed medical

10   provider.  For these reasons, defendants Bowers and St. Laurent should be granted summary

11   judgment as to plaintiff's claim that they failed to provide him with medication, i.e., Tramadol,

12   for the stomach pain he suffered.

13   Because defendants St. Laurent and Bowers are entitled to summary judgment as to the

14   merits of these claims, the undersigned need not address the second prong of the qualified

15   immunity analysis.

16   *State Law Claims*

17   Plaintiff alleges state law claims for negligence and gross negligence against all

18   defendants.  The elements of negligence under California law are: "(a) a legal duty to use due

19   care; (b) a breach of such legal duty; [and] (c) the breach as the proximate or legal cause of the

20   resulting injury."  Evan F. v. Hughson United Methodist Church, 8 Cal.App. 4th 828, 834 (1992)

21   Defendants first argue that plaintiff's state law claim form was accepted only to the extent

22   it asserted claims in the six months prior to the date of submission.  Under the California Tort

23   Claims Act ("CTCA"), a plaintiff may not maintain an action for damages against a public

24   employee unless he has presented a written claim to the state Victim Compensation and

25   Government Claims Board ("VCGCB") within six months of accrual of the action.  See Cal.

26   Gov't Code §§ 905, 911.2(a), 945.4 & 950.

27   Plaintiff's claim form was submitted on March 27, 2009.  (ECF No. 14 at 80).  Therefore,

28   plaintiff can only assert claims from September 27, 2008, until March 27, 2009.  (Id.)

24

1    Accordingly, defendants are entitled to summary judgment as to all of plaintiff's state law claims

2    arising prior to September 27, 2008, i.e., the claims against defendant Miller that occurred during

3    plaintiff's first stay in the Z Unit at HDSP.  Id.

4           Plaintiff alleges that he did not receive his medication while housed in the Z Unit

5    following his return to HDSP in November 2008 because defendant Miller failed to adequately

6    train the nurses she supervised regarding the distribution of pain medication.  Plaintiff also alleges

7    that that defendant Miller did not schedule an adequate number of nurses to distribute medication.

8           As discussed above, it is undisputed that defendant Miller was not responsible for training

9    nurses.  It is undisputed that the only nurse defendant Miller supervised was Nurse Clark, with

10   whom plaintiff had no problems.  It is also undisputed that when defendant Miller returned to

11   work in October 2008 after the leave of absence, she was no longer in charge of scheduling

12   nurses.  Based on these undisputed facts, defendant Miller breached no duty to plaintiff with

13   respect to his receipt of medication.  Accordingly, defendant Miller should be granted summary

14   judgment as to plaintiff's state law negligence claims.

15          Plaintiff alleges that defendant Swingle, the HDSP CMO, failed to adequately train and

16   supervise the nursing staff.  Plaintiff also alleges that defendant Swingle failed to implement and

17   enforce adequate medication distribution policies.  As discussed above, it is undisputed that

18   defendant Swingle did not supervise medication delivery and was not in charge of nurses.

19   Plaintiff also fails to identify any medication distribution policy created by defendant Swingle

20   which led to his failure to receive his medication.  For these reasons, defendant Swingle breached

21   no duty to plaintiff with respect to training and enforcement of medication distribution policies.

22          Plaintiff also alleges that defendant Swingle was responsible for plaintiff's failure to

23   receive Tramadol upon his return to HDSP.  As discussed above, defendant Swingle was not

24   involved in the decision to discontinue Tramadol nor the decision to reinstate it at a dose of 50

25   mg., twice per day.  For these reasons, defendant Swingle breached no duty to plaintiff with

26   respect to plaintiff's Tramadol prescription upon his return to HDSP.  Accordingly, defendant

27   Swingle should be granted summary judgment as to plaintiff's state law negligence claims.

28   ////

1    Defendants move for summary judgment as to plaintiff's negligence claim against

2  defendant St. Laurent because he had no involvement in this case.  The gravamen of plaintiff's

3  claim against defendant St. Laurent is that he failed to provide plaintiff with Tramadol.  It is

4  undisputed that psych techs cannot prescribe medication and can only distribute medications in

5  the manner prescribed by a licensed medical provider.  For this reason, the undersigned finds that

6  defendant St. Laurent breached no duty to plaintiff by failing to provide him with Tramadol.

7  Accordingly, defendant St. Laurent should be granted summary judgment as to plaintiff's state

8  law negligence claim.

9    Defendants move for summary judgment as to plaintiff's state law negligence claim

10  against defendant Bowers on grounds that he did nothing wrong.  It is undisputed that defendant

11  Bowers was not trained as a first responder and could not prescribe medication.  For these

12  reasons, the undersigned finds that defendant Bowers breached no duty to plaintiff by not

13  responding when plaintiff went "man down" on November 6, 2008, and by failing to provide

14  plaintiff with Tramadol.  Accordingly, defendant Bowers should be granted summary judgment

15  as to plaintiff's state law negligence claim.

16    Regarding plaintiff's negligence claims against defendant Medina, defendants argue that

17  he is immune pursuant to California Government Code Section 855.6.  This section provides,

18    Except for an examination or diagnosis for purpose of treatment,
19    neither a public entity nor a public employee acting within the
       scope of his employment is liable for injury caused by the failure to
20    make a physical or mental examination, or to make an adequate
       physical or medical examination, of any person for the purpose of
21    determining whether such person has a disease or a physical
       condition that would constitute a hazard to the health or safety of
22    himself or others.

23    Defendants have not adequately demonstrated that this section is applicable to the facts of

24  this case.  Plaintiff does not allege that defendant Medina failed to make an examination of him in

25  order to determine whether he had a disease or physical condition that constituted a hazard to

26  plaintiff.  Instead, plaintiff alleges that defendant Medina improperly discontinued pain

27  medication, which is more akin to failing to examine or diagnose plaintiff for purpose of

28  treatment.  In that case, this section does not shield defendant Medina from liability.  Plaintiff has

26

1    pled sufficient facts in support of his negligence claim against defendant Medina for

2    discontinuing plaintiff's Tramadol on November 10, 2008.

3          Plaintiff also alleges that defendant Medina acted negligently when he reinstated

4    plaintiff's Tramadol at an inadequate dosage on November 14, 2008.  As discussed above, this

5    dose was not significantly different from the dose recommended by Dr. Harrison.  Moreover,

6    defendant Medina increased plaintiff's dose of Tramadol to that recommended by the

7    gastrointestinal specialist Dr. Harrison, i.e., Tramadol 50 mg. three times per day, a short time

8    later.  Defendant Medina's actions in reinstating the Tramadol did not breach a duty of care to

9    plaintiff.

10         Finally, plaintiff also alleges that defendant Medina lied about re-ordering plaintiff's

11   medications and by interfering with prescriptions ordered by Dr. Nepomuceno.  As discussed

12   above, plaintiff has not presented evidence in support of these claims.  For this reason, defendant

13   Medina should be granted summary judgment as to plaintiff's state law negligence claim based

14   on these allegations.

15   Conclusion re:  Summary Judgment Motion

16         The undersigned recommends that defendants' summary judgment motion be denied as to

17   plaintiff's claim that defendant Medina acted with deliberate indifference and negligently when

18   he discontinued plaintiff's Tramadol prescription on November 10, 2008.  Defendants' summary

19   judgment motion should be granted in all other respects.

20         In their reply to plaintiff's opposition, defendants observe that in his opposition, plaintiff

21   attempts to expand his allegations.  As noted by defendants, the court previously denied

22   plaintiff's motion to amend his complaint.  (ECF No. 121.)  For these reasons, these findings and

23   recommendations address only those claims against defendants Miller, Medina, Swingle, St.

24   Laurent and Bowers contained in the operative amended complaint.

25         Attached to defendants' reply are objections to plaintiff's evidence and a motion to strike

26   some of this evidence.  (ECF No. 129-1 at 1-2.)  Defendants object to hearsay statements in

27   declarations submitted by plaintiff in support of his opposition.  Defendants also object to

28   statements regarding prescriptions and medical treatment pursuant to Federal Rule of Evidence

1   1002.  ("An original writing, recording or photograph is required in order to prove its content…")

2        Plaintiff's opposition to defendants' summary judgment motion is 488 pages long, most of

3   which is exhibits.  In considering defendants' summary judgment motion, the undersigned has

4   considered only the relevant, admissible evidence.  For this reason, defendants' motion to strike is

5   denied as unnecessary.

6        On March 25, 2013, plaintiff filed a motion for leave to file a supplemental motion to

7   oppose defendants' motion to strike.  This motion is denied as unnecessary.

8   Remaining Matters

9        On December 17, 2012, plaintiff filed a motion for an extension of time to obtain newly

10  discovered evidence.  In this motion, plaintiff alleges that he previously served defendants with

11  requests for production of documents in support of his claim that defendants Miller, Swingle and

12  St. Laurent were responsible for training staff.  Plaintiff alleges that in response, defendants

13  provided him with Inmate Medial Services Policies and Procedures ("IMSPP") Volumes 4 and 7

14  only.  Plaintiff alleges that volumes 1, 2, 3, 5 and 6 of the IMSPP were not produced, and he has

15  since learned that they contain relevant information.  In particular, plaintiff alleges that he has

16  learned that volume 1 is titled "Staff Training."  Plaintiff also alleges that defendants failed to

17  produce duty statements for Supervising Registered Nurse II, Chief Medical Officer, Licensed

18  Psych Tech and Senior Psych Tech.

19       Federal Rule of Civil Procedure 56(d) provides: "If a nonmovant shows by affidavit or

20  declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the

21  court may ... defer considering the motion or deny it."  "To prevail under ... Rule [56(d) ], [a]

22  part[y] opposing a motion for summary judgment must make (a) a timely application which (b)

23  specifically identifies (c) relevant information, (d) where there is some basis for believing that the

24  information sought actually exists."  Emp'rs Teamsters Local Nos. 175 & 505 Pension Trust Fund

25  v. Clorox Co., 353 F.3d 1125, 1129 (9th Cir. 2004).  "The burden is on the party seeking

26  additional discovery to proffer sufficient facts to show that the evidence sought exists, and that it

27  would prevent summary judgment."  Blough v. Holland Realty, Inc., 574 F.3d 1084, 1091 (9th

28  Cir. 2009).  Further, a court may deny "further discovery if the movant has failed diligently to

1   pursue discovery in the past."  Chance v. Pac–Tel Teletrac Inc., 242 F.3d 1151, 1161 n.6 (9th Cir.

2   2001).

3        In their opposition, filed January 3, 2013, defendants state that the four volumes of the

4   IMSPP cited by plaintiff in his motion for extension of time to obtain newly discovered evidence

5   contain 89 individual chapters, many of which have subparts.  Defendants argue that plaintiff has

6   not shown that these documents would preclude summary judgment.  Defendants argue that

7   plaintiff's request is overbroad, an undue burden and not relevant.  In an attempt to avoid further

8   discovery, defendants produced the table of contents for volumes 1, 2, 5 and 6 with the

9   opposition.  Defendants argue that the table of contents demonstrates not only that the chapters of

10   these volumes, but also the number of materials in these volumes, are not relevant to staff

11   training.  Defendants state that the only chapter possibly relevant would be Chapter 13 of Volume

12   3.  Defendants produced this chapter to plaintiff in their opposition.  Regarding the duty

13   statements, defendants state that they produced them to plaintiff.

14        The undersigned has reviewed the table of contents attached to defendants' opposition.

15   (ECF No. 126-1 at 2-9.)  The undersigned agrees with defendants that Chapter 13 of Volume 3

16   appears to be the most relevant to plaintiff's claims. The other sections are either not relevant or,

17   at best, marginally relevant.

18        Having reviewed the record, the undersigned finds no bad faith by defendants in their

19   responses to plaintiff's previous discovery requests.  As the docket shows, plaintiff has conducted

20   extensive discovery in this action.  For these reasons, and the reasons stated above, plaintiff's

21   motion for an extension of time to obtain newly discovered evidence is denied.

22        On June 17, 2013, plaintiff filed a request for subpoenas in order to obtain his witnesses

23   for trial.  This request is denied as premature.

24        Accordingly, IT IS HEREBY ORDERED that:

25        1.  Plaintiff's motion for an extension of time (ECF No. 124) is denied;

26        2.  Plaintiff's motion for leave to file a supplemental opposition (ECF No. 136) is denied;

27        3.  Plaintiff's motion for subpoenas (ECF No. 139) is denied; and

28   ////

1    IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF

2    No. 122) be denied as to plaintiff's Eighth Amendment and state law claims against defendant

3    Medina based on the discontinuation of plaintiff's Tramadol prescription on November 10, 2008;

4    defendants' motion should be granted in all other respects.

5    These findings and recommendations are submitted to the United States District Judge

6    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

7    after being served with these findings and recommendations, any party may file written

8    objections with the court and serve a copy on all parties.  Such a document should be captioned

9    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

10   objections shall be filed and served within fourteen days after service of the objections.  The

11   parties are advised that failure to file objections within the specified time may waive the right to

12   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13   Dated:  August 8, 2013

14

15                                          KENDALL J. NEWMAN
                                            UNITED STATES MAGISTRATE JUDGE

16   bak2757.sj

17

18

19

20

21

22

23

24

25

26

27

28

                                            30